```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
                                                           :
                                                           :        08 Civ. 10934 (KBF)
                                                           :
IN RE 650 FIFTH AVENUE AND                                 :
RELATED PROPERTIES                                         :        OPINION & ORDER
                                                           :
                                                           :
                                                           :
                                                           :
----------------------------------------------------------- X

KATHERINE B. FORREST, District Judge:

In 2008, the United States Government commenced this in rem civil

forfeiture action with respect to assets owned by Assa Corporation, an entity

incorporated in New York, and its parent, Assa Company, Limited, a corporation

domiciled in Jersey, Channel Islands, United Kingdom (together, "Assa").  (ECF No.

1.)[1]  On November 12, 2009,[2] the Government filed a Verified Amended Complaint

("VAC") adding assets owned by the Alavi Foundation ("Alavi" or "the Foundation")[3]

and the 650 Fifth Avenue Company ("650 Fifth Ave. Co.").  The 650 Fifth Ave. Co. is

a partnership between Alavi and Assa in which Alavi owns a 60% interest and Assa

---

[1] Over the course of this lengthy litigation, the Court has issued a number of decisions which set forth the procedural background of the action (including its coordination with other actions by judgment creditors).  See, e.g., In re 650 Fifth Ave., No. 08 Civ. 10934 (KBF), 2013 WL 2451067 (S.D.N.Y. June 6, 2013) (granting partial summary judgment to Judgment Creditors against defendants Assa Corp. and Assa Co., Ltd. on TRIA claims); In re 650 Fifth Ave., 881 F. Supp. 2d 533 (S.D.N.Y. 2012) (denying defendant-claimants' motions to dismiss Judgment Creditor actions); In re 650 Fifth Ave., No. 08 CIV. 10934 (RJH), 2011 WL 3586169 (S.D.N.Y. Aug. 12, 2011) (denying defendant-claimants' motion to stay), reconsideration denied, No. 08 Civ. 10934 (RJH), 2012 WL 363118 (S.D.N.Y. Feb. 2, 2012); In re 650 Fifth Ave. & Related Properties, 777 F. Supp. 2d 529 (S.D.N.Y. 2011) (denying motion to dismiss forfeiture action).
[2] The Verified Amended Complaint did not appear on ECF until November 16, 2009.  (ECF No. 51.)
[3] Alavi is the current name of a foundation organized initially in 1978 as the Pahlavi Foundation.  In 1980 the Pahlavi Foundation changed its name to the Mostazafan Foundation of New York ("MFNY").  In 1992, the MFNY changed its name to the Alavi Foundation.  These changes are described more fully in the Factual Background section infra.

owns a 40% interest.  In 1989, Alavi's predecessor entity, the Mostazafan
Foundation, contributed the real property located at 650 Fifth Ave. (referred to as
the "Building") to the partnership.  Transactions and conduct relating to the
Building have played key roles in this litigation.  (Together, Assa, the 650 Fifth Ave.
Co. partnership and Assa are referred to as "Claimants".)

The 650 Fifth Ave. Co. also owns several additional properties[4] and bank
accounts[5] also at issue in this action (from time to time referred to as the
"Defendant Properties").

The Government, Assa, Alavi, and the 650 Fifth Ave. Co. have all moved for
summary judgment.  The instant motions became fully briefed on September 5,
2013, and the Court provided oral rulings on September 11, 2013.  The Court denied
the motions by Assa, Alavi, and the 650 Fifth Ave. Co., and indicated that it was
granting the Government's motion; the instant Opinion and Order resolves the
Government's motion.[6]

The Government's Motion

The Government seeks forfeiture pursuant to two theories:  first, that
Claimants have engaged in violations of the International Emergency Economic
Powers Act ("IEEPA") and certain Iranian Transaction Regulations ("ITRs") issued

---

[4] The Government seeks forfeiture of eight parcels of real property, including the Building,
denominated in the VAC as "Defendant Real Property-1" through "Defendant Real Property-8."
(VAC ¶¶ 1.a – 1.i, Nov. 16, 2009, ECF No. 51.)  The Verified Amended Complaint asserts that Alavi /
Mostazafan Foundation acquired Properties-2 to 8 via various transactions between 1988 and 1995.
(Id. ¶¶ 134 – 143.)  It further alleges that Alavi has spent millions of dollars on land and
improvements to the properties.  (Id.)  However, as discussed below, there is an insufficient factual
record on this motion to determine whether Properties 2 – 8 are subject to forfeiture.
[5] The Government asserts that nine bank accounts — four held in the name of Assa, two in the name
of 650 Fifth Ave. Co. and three in the name of Alavi — are subject to forfeiture.  (Id. ¶¶ 1.j – 1.r.)
[6] The Court also rules infra on Alavi's Motion to Dismiss for Due Process Violations, ECF No. 712.

by the United States Treasury.  The Government asserts that the Defendant
Properties are proceeds traceable to such violations are subject to forfeiture under
18 U.S.C. § 981(a)(1)(C) (2009).  Second, the Government claims that pursuant to 18
U.S.C. § 981(a)(1)(A), the same assets are separately subject to forfeiture as
involved in the promotion and/or concealment of a money laundering transaction or
as part of an international money laundering transaction.

The Government's theories raise the following questions: (1) whether there is
a triable issue of fact as to whether any Claimant has violated the IEEPA or the
money laundering statutes; and, if so, (2) whether there is a triable issue of fact as
to which property is therefore subject to forfeiture.  As discussed below, while not
raised by any party on this motion (save the Government in a footnote in its
opening submission), the Court has also examined whether there is a triable issue
of fact as to an "innocent owner" defense which would preclude an order of forfeiture
at the summary judgment stage.  And also while also not raised by any party on
this motion, the Court has examined whether there is a triable fact as to the five-
year of statute of limitations under the Civil Asset Forfeiture Reform Act of 2000
("CAFRA") that would also preclude an order of forfeiture at this stage.[7]  Each

---

[7] Alavi did raise the statute of limitations argument in its motion for partial summary judgment
against the Government.  (See Alavi Mem. in Supp of Mot. for Partial Summ. J. against Gov't at 12
n.4.)  Assa argues on this motion that the Government is not entitled to forfeiture of any funds that
existed in Assa's bank accounts more than a year prior to the date upon which the Government filed
its initial Verified Complaint.  (Assa's Memorandum of Law in Opp. to Gov't's Mot. for Summ. J. at
16.)  That argument is discussed infra in Part V.D.1.

Claimant and the various <u>in</u> <u>rem</u> properties are considered separately in relation to the record presented.[8]

Based on the undisputed evidence,[9] the Court finds that, as to Assa, (1) there is no triable issue of fact as to whether Assa has engaged in violations of ITRs promulgated pursuant to the IEEPA; (2) there is also no triable issue of fact as to whether Assa has engaged in both the promotion and concealment of money laundering as well as international money laundering in violation of 18 U.S.C. § 1956 (2012); (3) Assa has failed to raise a triable issue of fact as to which of its assets are subject to forfeiture; and, finally, (4) there is no triable issue with respect to whether Assa is an innocent owner or whether the action was timely brought.[10]

---

[8] The record on this motion is largely a "paper record" — based substantially on documents from Alavi's own files. Many witnesses who would likely have personal, first-hand knowledge of the facts have invoked their Fifth Amendment privilege against self-incrimination. In such circumstances, this matter is particularly amenable to resolution on summary judgment. Due to the lack of testimony (via the Fifth Amendment assertions) from witnesses who might be able to offer the most significant testimony on substantive issues from Claimants, the most critical issues must be resolved on the paper record. Credibility determinations would play an unusually limited role at trial. The Court has of course not made any credibility determinations in its consideration of the instant motion. <u>See, e.g.</u>, <u>Jeffreys v. City of New York</u>, 426 F.3d 549, 554 (2d Cir. 2005) ("[I]t is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage . . .").

[9] Assa objects to this motion as untimely on the grounds that discovery is not yet complete. While there have been ongoing issues raised regarding alleged discovery deficiencies, discovery has, in fact, long been closed. The Court has resolved all open issues as to alleged deficiencies. Moreover, Assa proffers no relevant facts that it would seek to develop were discovery reopened. In addition, Claimants have raised a variety of evidentiary objections with respect to the documents and depositions on which the Government's motion relies. However, as set forth below, the Court has considered these objections and finds them to be without merit as to all material facts underlying its decision.

[10] Among its arguments, Assa asserts that its due process rights have been violated by these proceedings. This argument is without merit. It is part of what can only be called an overall strategy by Claimants to litigate every conceivable issue (worthy or not) in attempt to delay final resolution. The due process argument is particularly frivolous: Assa and all Claimants have received ample process. Various versions of the due process arguments have been and addressed repeatedly on the record at various conferences with this Court. (<u>See</u> Memorandum of Law in Support of Claimants' Mot. to Dismiss for Due Process Violations, Aug. 21, 2013, ECF No. 713.) Claimants' standalone "due process" motion is nothing more than a collection and reargument of the many discovery complaints the Court has previously reviewed. The Court has ruled on all

Assa's IEEPA violations acting as a front for Bank Melli occurred continuously —
that was its "raison d'être" — and certainly through the initial filing of the first
complaint in this action in December 2008.[11]

As to the Alavi Foundation and the 650 Fifth Ave. Co. (together, "Alavi"), the
Court finds no triable issue of fact as to their violations of the IEEPA and the ITRs
banning the provision or export of services to Iran; they provided such services.[12]
As an initial matter, the Court's determination with respect to Assa leads
inexorably to the following result: it is conceded that Alavi provided services to Assa
(in managing the partnership and Building); as set forth below, the Court has found
that, based on the uncontroverted record evidence, Assa was (and is) a front for
Bank Melli, and thus a front for the Government of Iran.  Thus, an IEEPA violation
by Alavi is established by this conduct alone.  However, there is a far broader
violation — one that involves not simply an unknowing and innocent provision of
services to Iran, but providing those services to assist Iran by shielding and
concealing Iranian assets.

The Government also alleges that the Defendant Properties are forfeitable as
properties "involved" in money laundering transactions and activities prohibited by

---

material issues raised as part of the "due process" arguments, and Claimants cannot now reargue
those numerous prior rulings with this motion.  Accordingly, as set forth on transcripts of many
proceedings and in the Court's numerous prior orders, Claimants have received all process due.  The
motion is denied.  This terminates the motion at ECF No. 712.

[11] In December 2008, the 650 Fifth Ave. Co. also made a direct "partnership distribution" payment to
Assa before this action commenced and the Court directed that further such payments be made to
the custody of the U.S. Marshal.

[12] Furthermore, none of the arguments as to discovery issues related to the FBI, IRS, and OFAC has
been raised by Alavi in opposition to the instant motion, and they are not deemed material so as to
defeat Alavi's motion.  At long last, despite the extraordinary amount of time the parties and Court
spent on discovery from these entities, no produced material was significant enough to any issue on
this motion for Claimants to even have cited.

18 U.S.C. § 1956, namely the laundering of IEEPA proceeds and of funds in furtherance of IEEPA violations.  The Government alleges — and the Court agrees — that no triable issue exists as to the conspiracy to launder money between Alavi and Assa/Bank Melli, which led to violation of the statutes barring promotion, concealment, and international money laundering activities.

Alavi's core defense to all of the Government's assertions is that there is a triable issue concerning whether, between 1995 (when providing services to Iran became illegal) and the date of the lawsuit, it "knew" that Assa was controlled by Iran.  There is no triable issue as to this question.  Its premise is implausible: that, sometime after the conception and birth of Assa as the direct descendant of Bank Melli, and in a procedure in which Alavi was midwife, Alavi lost track of Bank Melli's previously clear control of Assa.

The Government argues that Alavi asserts a sort of collective amnesia.  The Court finds the analogy apt and its reality implausible.  No rational juror could believe in such extraordinary amnesia; many of the same Alavi board members who were indisputably involved in the creation of Assa as a front for Bank Melli in 1989 remained with, or returned to positions with, Alavi after the ITRs were instituted in 1995.  No evidence in the record indicates that, despite changes in who owned shares in Assa on paper, that the ultimate owner and beneficiary of Assa was anyone other than Bank Melli.  Similarly, there is no triable issue as to Alavi's

knowledge that it knew or was willfully blind as to whether the Iranian Government ultimately owned and controlled Assa.[13]

Nor does any Claimant raise a triable issue as to any affirmative defense. As discussed below, Alavi's statute of limitations argument relies upon a strained reading of the forfeiture statutes and a wishful view of the facts. If this Court were to credit the statute of limitations argument made comprehensively by Alavi, then the extraordinary result would be that a company working openly as a front for the Government of Iran (Assa) — or that helped create the "cover" to shield the Government of Iran's identity, and has continuously provided services in furtherance of that fiction — would be immune from suit. That is not the law. Indeed, Claimants' violations were numerous and well within the statute of limitations

A second, potentially available affirmative defense would be that a Claimant was an "innocent owner." Despite their burden to do so in opposition to a motion for summary judgment, no Claimant has raised the affirmative defense that it is an "innocent owner" of the property. However, as discussed below, the Court has scoured the record and determined that on the evidentiary record, no triable issue of fact could be raised as to such a defense. The critical issue as to whether a Claimant is an "innocent owner" overlaps with the finding of knowledge in the context of both the IEEPA and money laundering violations.

---

[13] The 650 Partnership is simply Alavi and Assa together.

Accordingly, the Court GRANTS the Government summary judgment as to the interests of Alavi and the 650 Fifth Ave. Co. in the Building and the bank accounts in the names of those entities.[14]

In consideration of these findings, the only triable issues that remain in the forfeiture action are (1) whether the seven real properties held in the name of the Alavi Foundation alone and purchased prior to 1995 are "proceeds" of the IEEPA violations or are "involved in" money laundering and therefore forfeitable; and (2) the validity of the innocent owner claims filed by several groups of private judgment creditors whose claims are not at issue on the Government's motion.  These two issues have been severed for further proceedings.  (<u>See</u> Order of September 12, 2013, ECF No. 851.)[15]

## I.   <u>EVIDENTIARY OBJECTIONS</u>

The Government has filed a statement of undisputed facts pursuant to Local Rule 56.1 (Gov.'s R. 56.1 Stmt. of Undisputed Facts in Supp. of Mot. for Summ. J. ("Government's SOF"), Aug. 17, 2013, ECF No. 688.)  The facts set forth in the Government's SOF are primarily drawn from business records maintained by the

---

[14] The Court severs the additional seven properties held in the name of Alavi only.  There is insufficient evidence on this record to determine their derivation or use.  They are therefore excluded from the Court's grant of summary judgment to the Government.  While procedurally the Court could simply deny the motion as to these properties, severance is equally appropriate.  The parties may well be able to brief the facts as to the seven properties and avoid the need for a trial simply as to them.

[15] The Court also notes that resolution of a separate litigation against Assa, Alavi and the 650 Fifth Ave. Co. brought by many of the same private judgment creditor groups pursuant to the Foreign Sovereign Immunities Act ("FSIA") and the Terrorism Risk Insurance Act ("TRIA") is scheduled to either be tried to the bench on September 30, 2013, or immediately resolved on summary judgment.

Claimants and produced as part of this litigation.[16]  None of the Claimants have disputed the substance of the majority of factual statements.  Instead, they each rely on some version of the following:

(1) Each Claimant objects to numerous factual statements on the basis that the documents are in Farsi and a certified translation has not yet been presented (referred to as the "Farsi Objection") (e.g., Assa's R. 56.1(b) Stmt. in Resp. to Gov't's R. 56.1 Statement ("Assa Statement") ¶¶ 21, 23, 25, 34, 38, 41, 43, 45, 46, et seq., Aug. 30, 2013, ECF No. 763); Alavi & 650 Fifth Ave. Co.'s Resp. to Gov't's Stmt. of Undisputed Facts ("Alavi Statement") ¶¶ 12, 19 – 21, 25 – 31; 39 – 43, et seq., Aug. 30, 2013, ECF No. 769; have not been authenticated (e.g., Assa Statement ¶ 35 regarding the Assa Certificate of Incorporation); or are hearsay (e.g., Assa Statement ¶¶ 40 – 46, et seq.; each of the Alavi Statements as to which a "Farsi Objection" has been made also contains a hearsay objection);[17]

(2) Assa repeatedly asserts that it lacks "sufficient information to admit, deny or dispute" (e.g., Assa Statement ¶¶ 1 – 17, 19 – 31, et seq.); and

---

[16] Because the documents cited in the Government's SOF are drawn primarily from Alavi's files, knowledge of their contents is fairly attributed to Alavi.  See Fairmont-Tillett, Ltd., #1, for Use & Benefit of Am. Title Ins. Co., v. First Memphis Realty Trust, 691 F.2d 991, 991 (11th Cir. 1982) (stating that an "entity can be held to know what is or should be in its own files"); cf. In re Atlas Air Worldwide Holdings, Inc. Secs. Litig., 324 F. Supp. 2d 474, 490 (S.D.N.Y. 2004) (imputing knowledge of the falsity of a company's financial statements to officers of the company).

[17] Each Claimant also admits certain facts. E.g., Assa Statement ¶¶ 97 (Assa never received a license from OFAC), 98 ("When asked about the relationship of the Alavi Foundation, the Government of Iran, Bank Melli, and the Iranian Ambassador for the United Nations, many of the Alavi Foundation former board members asserted their Fifth Amendment privilege against self-incrimination."); Alavi Statement ¶¶ 22 (on February 26, 1987, the Foundation's Board resolved to incorporate a holding company named 650 Fifth Avenue Company), 55 – 56 (relating to revenues), 85 (Alavi has played a critical role in managing the partnership), 92 (Bank Melli Iran ("Bank Melli") is wholly owned and controlled by the Government of Iran), 96 (Alavi never received a license from OFAC).

(3) Alavi also states that it disagrees with the testimony of two witnesses and will cross-examine them at trial, but it fails to proffer evidence that directly contradicts the particular testimony (see Alavi Statement ¶¶ 35, 71 (relating to "Rahi" and "Modarres")).

The law is clear that on a motion for summary judgment, a party may rely on evidence which, while not in an admissible form on the motion, presents the type of facts that could be introduced in an admissible form at trial. See Brink v. Union Carbide Corp., 210 F.3d 354 (2d Cir. 2000) ("[T]he evidence proffered by the party opposing summary judgment must be of a type that would be admissible at trial.").

    A.   The "Farsi Objection"

The most sweeping objection Claimants have asserted — the Farsi Objection — is without merit. The elimination of that objection leaves the vast majority of statements in the Government's SOF undisputed.

As an initial matter, many of the Farsi documents were produced by Claimants as business records in civil discovery. It is undisputed that the Government had previously provided an initial English translation as to each of the documents as to which a Farsi Objection has been asserted on summary judgment; the only objection is that those translations are not certified. Yet none of the Claimants has raised an issue with respect to the accuracy of a single word in those translations. Nor have they put forward counter-translations that call into question the reliability of those provided by the Government. Indeed, since most documents are their business records, Alavi and the 650 Fifth Ave. Co. were in a particularly

10

good position and were certainly motivated to assert any substantive disagreements with the proffered translations.

In addition, the Government has now, in fact, proffered certified translations for many of the documents originally in Farsi.  There can be no serious dispute that a certified translation could be obtained as to any document set forth in the Rule 56.1 Statement.  In such circumstances, the law is clear that the Court may properly consider facts of a type that may be proffered in an admissible form at trial.  Brink, 210 F.3d at 354.  Any objections must therefore take the form of disputes over the reliability of those translations, not their lack of certification.  Claimants have raised no such objection (with the caveat of the omnibus hearsay objection, discussed below).

> B.   Remaining Evidentiary Objections

Claimants have also asserted an undifferentiated, non-specific, and omnibus hearsay objection as to most of the documents upon which the Government's motion relies.  It appears that Claimants are throwing the hearsay objection generally at the proverbial wall to see if it sticks somewhere.  Such non-specific objections are insufficient to support a serious objection to evidence proffered on summary judgment.  See, e.g., VW Credit, Inc. v. Big Apple Volkswagen, LLC, No. 11 Civ. 1950 (PAE), 2012 WL 5964393, at *5 (S.D.N.Y. Nov. 29, 2012) ("[G]eneral protestations . . . are insufficient to raise a genuine issue of material fact." (citing Barbour v. City of White Plains, 700 F.3d 631, 634 (2d Cir. 2012))).

However, the Court has an independent obligation to ensure that the evidence upon which summary judgment is based could be admissible at trial.  See Fed. R. Civ. P. 56(e) (providing that affidavits used at summary judgment "shall set out facts that would be admissible in evidence"); Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment.").  The Court has reviewed each of the documents to which it refers below.  None constitute inadmissible hearsay.

The documents to which the Government cites and to which the Court refers in this decision are first, business records of Alavi and the 650 Fifth Ave. Co., which were produced in discovery.[18]  In addition, counsel for Alavi and 650 Fifth Ave. has himself acknowledged that the documents authenticated by Agent McReynolds were produced by Alavi during civil discovery.  (FPTC Hr'g Tr. 20, 32, 39, 86, Sept. 4, 2013.)[19]  Second, as is evident from the description of the documents below, a number of the documents contain admissions of a party-opponent.  Third, to the

---

[18] At trial, the parties would either have stipulated to authenticity, or the documents could have been (and were on this motion) separately authenticated by Agent Jennifer McReynolds, the FBI custodian involved in an investigation of Alavi.

Under the "business records" exception to the rule against hearsay, records may be admitted as evidence  if "(A) the record was made at or near the time by — or from information transmitted by — someone with knowledge; (B) the record was kept in the course of a regularly conducted activity of a business,  organization, occupation, or calling, whether or not for profit; (C) making the record was a regular practice of that activity; (D) all these conditions are shown by the testimony of the custodian or another qualified  witness, or by a certification that complies with Rule 902(11) or (12) or with a statute  permitting certification; and (E) neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness." Fed. R. Evid. 803(6).  See, e.g., Davis v. City of New York, No. 10 Civ. 0699 (SAS), 2013 WL 2298165, at *3 – 4 (S.D.N.Y. May 14, 2013).

[19] A small number of documents, not raised by any party on this motion, were placed on a trial exhibit list that was not part of Alavi's civil production but have been in Alavi's files.  The Court ordered these documents removed from the trial exhibit list.  See In re 650 Fifth Ave., No. 08 Civ. 10934 KBF, 2013 WL 4792821, at *4 n.5 (S.D.N.Y. Sept. 9, 2013) (citing Tr. of Sept. 4, 2013, Hear'g at 85 – 89.)  Those documents were not cited in, and play no role in resolution of, this motion.

extent that the Government refers to communications from third parties, those fall within a co-conspirator exception or are not offered for the truth. Fourth, certain handwritten notes constitute present sense impressions, or are reflective of the declarant's then-existing state of mind. Accordingly, Claimant's blanket hearsay objection is without merit.

To the extent that Assa has responded to factual claims based on its assertion that it lacks knowledge to confirm or deny certain facts, many are irrelevant to the outcome of this motion or have been admitted by Alavi (e.g., Assa Statement ¶ 1, that in 1973, the Pahlavi Foundation was formed as a New York not-for-profit corporation by Shah Mohammad Reza Pahlavi); or the facts demonstrating the truth of the assertion are straightforward and apparent (e.g., Government's SOF ¶ 5: "On April 1, 1979, the previously exiled Shi'ite religious leader, Ayatollah Ruhollah Khomeini (the "Ayatollah"), proclaimed the establishment of the Islamic Republic of Iran."); or the Claimant with the more specific knowledge (Alavi) has not disputed the substance of the factual statement. Accordingly, this objection is also without merit as to any fact material to the instant motion.

Finally, Alavi has objected to the Government's reliance on deposition testimony of Messrs. Rahi and Modarres, but has not proffered any particularized facts directly contradicting that testimony. Since both individuals are currently on the Government's trial witness list, their depositions are appropriately considered on summary judgment. Brink, 210 F.3d at 354.

In short, Claimants' sweeping objections to the Government's statement of facts are without merit.  The Court's decision rests on the facts recited below as to which no objection has merit.

## II.   FACTUAL BACKGROUND

The lineage of the Alavi Foundation plays a particularly important role in the facts at issue in this matter, but its name changes add an element of potential confusion.  Thus, at the outset, the Court notes that the Alavi Foundation started off its existence as the Pahlavi Foundation; its name was changed to the Mostazafan Foundation of New York and then changed again to the Alavi Foundation.  In addition, it is also useful to focus at the outset on Alavi's admission (Alavi Statement ¶ 92) that Bank Melli is wholly owned and controlled by the Government of Iran; Assa does not put forward any facts to dispute that fact.

The following facts are materially undisputed, unless otherwise noted:

### A.   Origins of the Alavi Foundation

In 1973, the Pahlavi Foundation ("the Foundation") was formed as a New York not-for-profit corporation by Shah Mohammad Reza Pahlavi.  (See Government's SOF ¶ 1; Decl. of Jennifer McReynolds ("McReynolds Decl.") Ex. 1 (Cert. of Incorp. of Pahlavi Found.).)  In 1974, the Foundation acquired property located 650 Fifth Avenue, New York, New York.  Because Iranian law prohibited Bank Markazi from making loans to non-banking institutions, it loaned $42 million to Bank Melli, a bank wholly owned by the Iranian Government.  (Government's SOF ¶ 3; McReynolds Decl. Ex. 3 (June 30, 1978, Pahlavi Found. Minutes.)  In 1975,

14

the Foundation borrowed that $42 million from Bank Melli Iran to retire an existing loan on the property and to construct a building ("the Building") on the property. (Id.)

In 1979 Iran experienced a revolution and change in its government.  On April 1, 1979, the Ayatollah Ruhollah Khomeini (the "Ayatollah") proclaimed the establishment of the Islamic Republic of Iran.  (Government's SOF ¶ 5; VAC ¶ 25; Alavi Ans. ¶ 25.)  In 1979, the Ayatollah ordered the formation of the Bonyad Mostazafan va Janbazan ("Bonyad Mostazafan") to centralize, take possession of, and manage property controlled by the revolutionary government.  (Government's SOF ¶ 6; Supplemental Declaration of Michael Lockard ("Lockard Decl."), Ex. 1 (Clawson Report at 1 – 3; see also Islamic Revolution Mostazafan Foundation, http://www.irmf.ir/En/default.aspx (last visited Sept. 15, 2013)).[20]

In 1980, the Pahlavi Foundation was renamed the "Mostazafan Foundation of New York" ("MFNY") ("the Foundation").  (Government's SOF ¶ 10 – 11; McReynolds Decl. Ex. 13 (Restated Cert. of Incorp. of Pahlavi Found.).)  Seyed Mojtaba Hesami-Kiche was an employee of the Bonyad Mostazafan who was transferred to a German import/export company owned by the Bonyad Mostazafan in 1984 – 85.  (Government's SOF ¶ 13; McReynolds Decl. Ex. 15 (Hesami-Kiche Tr. 35 – 37).)  In approximately 1983, Hesami-Kiche was appointed to the Board of the Foundation.  (Government's SOF ¶ 14; McReynolds Decl. Ex 16.)  The Foundation

---

[20] The Court granted Claimants' motion to preclude large sections of the Clawson Report at the September 4, 2013, final pretrial conference.  (FPTC Hr'g Tr. 61 – 70.)  The discussion of the 1979 formation of the Bonyad Mostazafan, however, is drawn from a portion of the Clawson Report that the Court did not preclude.  (Id. at 70.)

sent quarterly or annual reports to Hesami-Kiche, who would forward them to the Office of the Prime Minister or the head of the Bonyad Mostazafan.  (Government's SOF ¶ 17; McReynolds Decl. Ex. 15 (Hesami-Kiche Tr. 158).)

    B. <u>The 1989 Tax Transaction</u>

   In a letter dated July 25, 1987, the Iranian Deputy Prime Minister and head of the Bonyad Mostazafan, Tahmasb Mazaheri, reported to the Prime Minister of Iran, Mir-Hussein Mousavi, about a tax situation relating to income generated by the Building. (Government's SOF ¶ 19.)[21]

   One potential solution to the tax issue was the creation of an entity in New York which would own 100 percent of the Building and take responsibility for the Bank Melli loan.  (Government's SOF ¶ 20.)  Part of the new company's stock equal to the outstanding amount of the Bank Melli loan would then be sold to a European company and the Bank Melli debt would be settled.  (<u>Id.</u>)  This entity and the partnership that would ensue would cause a transfer of $45 million to the "Islamic Republic of Iran Central Bank" to settle the debt.  (<u>Id.</u>)

   This solution was discussed with the Director of the Central Bank of Iran and the Director General of Bank Melli, Majid Ghasemi, who promised to assist. (Government's SOF ¶ 21.)  Mazaheri requested Mousavi's "recommendation of this action" and stated that it "will surely be beneficial to the Islamic Republic."  (<u>Id.</u>)

---

[21] The Government's SOF is the governing document.  (Local Rule 56.1.)  The Court notes that, while the Government's SOF contains the facts and quotations described here, the Declaration of Jennifer McReynolds contains three typographical errors and/or omissions that refer to different documents, in McReynolds Decl. ¶ 22 (referring to Ex. 21), ¶ 29 (referring to Ex. 28), and ¶ 31 (referring to Ex. 30).  The Court also notes that all documents were authenticated by Agent Jennifer McReynolds on this motion.

On February 26, 1987, the MFNY board incorporated a holding company named 650 Fifth Avenue Management Corporation. (Government's SOF ¶ 22; McReynolds Decl. Ex. 22 (Feb. 1987 MFNY Consent in Lieu of Meeting).)

On November 25, 1987, Mazaheri wrote to Prime Minister Mousavi requesting approval of the plan to resolve the Foundation's financial problems and for $40 million to be set aside for the Foundation.  (Government's SOF ¶ 25; McReynolds Decl. Ex. 28 (Nov. 26, 1987 Mazaheri letter).)  In a letter dated December 1, 1987, Mousavi's office responded to Mazaheri's letter, stating, "Mr. Mousavi the Prime Minister agreed with both suggestions."  (Government's SOF ¶ 26; McReynolds Decl. Ex. 28 (Dec. 1, 1987 Mohajeri letter).)  Mazaheri forwarded Mousavi's letter to Ghasemi on December 5, 1987, copying the Deputy Executive Prime Minister of Iran, with a request that Ghasemi transfer $40 million "into an account number that will be communicated . . . by the Foundation . . . ." (Government's SOF ¶ 26.)

In 1989, the Foundation pursued another solution to the tax problem — a long-term lease of the Building to another entity.  (Government's SOF ¶ 27; McReynolds Decl. Ex. 29 (March 14, 1989 Badr letter).)  In a letter dated March 14, 1989, Seyed Mohammad Badr Taleh, then Managing Director of the MFNY, wrote to Mazaheri, proposing that the MFNY enter into a 49-year lease of the Building's retail space to avoid the tax.  (Id.)  In May 1989, the MFNY, the Bonyad Mostazafan, and Bank Melli Iran met in Tehran, Iran to finalize an agreement for a partnership; the meeting was attended by Badr Taleh, Issa Shahsavar Khojasteh

17

(who was the Assistant Director of Commerce and International Affairs for the Bonyad Mostazafan), and Mohammad Hossein Behdadfar, a Bank Melli board member.  (Government's SOF ¶ 28.)  The minutes of the Foundation for that meeting state that it was decided that "Bank Melli Iran will partner with the New York Foundation."  (Id.)  To accomplish this, Bank Melli Iran would create "two partnerships in Jersey Island"; one of those partnerships would "cooperate with the New York Foundation through the other partners," and "a representative of Bank Melli should supervise the plan." (Id.)

On August 19, 1989, Khojasteh wrote to Mohammed Bagherian, then head of the Bonyad Mostazafan, regarding the "partnership agreement between the Mostazafan Foundation of New York and Bank Melli Iran."  (Government's SOF ¶ 30; McReynolds Decl. Ex. 31 (Aug. 19, 1989 letter from Khojasteh to Bagherian).) He requested that Bagherian "endorse the partnership" between Assa, which he stated "belongs to Bank Melli," and the MFNY.  (Id.)  Khojasteh noted that the "partnership is based on prior agreements with the Ministry of Finance, Bank Melli Iran, and the Islamic Revolution Martyrs and Self Sacrifices Foundation [Bonyad Mostazafan]." (Id.)  Bagherian endorsed that letter with the instruction: "[c]onsidering that Bank Melli is a party, and in order to advance the affair, we would like to ask that you proceed with your plan."  (Id.)

On July 31, 1989, the Mostazafan Foundation entered into an agreement with Assa Corp. to form a partnership called the 650 Fifth Avenue Company. (McReynolds Decl. Ex. 37 (Partnership Agreement of 650 Fifth Ave. Co. 1).)  The

formal closing between the Foundation and Assa occurred on October 31, 1989. (McReynolds Decl. Ex. 113 (Report of Closing).)  The Foundation contributed the property located at 650 Fifth Avenue, valued at $83,200,000 at the time of this contribution, to Fifth Ave. Co., and Assa contributed $44,800,000.  (McReynolds Decl. Ex. 37 (Partnership Agreement 7–8).)  Today, the Foundation holds 60% of the interest in the partnership, and Assa holds 40%.  Since its inception, the Foundation has served as the managing partner of Fifth Ave. Co., which contracts for management services with third parties.  (McReynolds Decl. Ex. 37 (Partnership Agreement 21).) Pursuant to the partnership agreement, the Foundation and Assa were entitled to receive, and have received, distributions of income from Fifth Ave. Co. each calendar quarter.  (McReynolds Decl. Ex. 37 (Partnership Agreement 18).)

On November 1, 1989, Badr Taleh wrote to the General Director of Bank Melli to report that Assa Corp. was a partner in the ownership of 650 Fifth Avenue ("the Building") and to note that this arrangement would exempt Bank Melli from millions of dollars in taxes.  (Government's SOF ¶ 34; McReynolds Decl. Ex. 111 (Nov. 1, 1989 Badr letter to Bank Melli).)  He also expressed his thanks to Behdadfar and to Mohammad Karjooravary, the president of Bank Melli's New York branch, noting that Behdadfar and Karjooravary "have truly done whatever possible to safeguard the interests of the Islamic Republic." (Id.)

The initial directors of Assa were Mohsen Kakavand, regional manager of Bank Melli's London office, and Behdadfar.  (McReynolds Decl. Exs. 34 (Statement by incorporator of action taken in lieu of organization meeting of Assa Corp.), 35

(Rahi Tr. 69, 158).)  In 1989, Kamal Kharrazi became the Iranian Ambassador to the United Nations.  (Government's SOF ¶ 58; VAC ¶ 49; Alavi & 650 Fifth Ans. ¶ 49.)

        C.  <u>Proposed Assa Transactions in the Early 1990s</u>

In February 1990, Karjooravary summarized the partnership and its purpose to Gholamreza Rahi, director of Bank Melli's Overseas Network Supervisory Department.  (Government's SOF ¶ 37; McReynolds Decl. Ex. 32 (Feb. 2, 1990 telex from Karjooravary to Rahi).)  Karjooravary described the transactions that had occurred in order to resolve the tax issues relating to the Building as follows: "after ample study at the New York Foundation [MFNY], the Central Office of the Foundation [Mostazafan Foundation, Tehran, Iran], and Bank Melli in Tehran, it was decided to form a company called Assa Channel Islands which would be financed by the bank and under direction of Mr. Behdadfar and Mr. Kakavand." (<u>Id.</u>)  He also stated that the solution to the tax issue had been achieved through the "efforts of the Foundation and bank officials in Tehran and New York."  (<u>Id.</u>)

A 1990 telex describes a transfer of Assa (referred to as the "mother company") from indirect ownership by Bank Melli officials to ownership by Bank Melli itself.  (McReynolds Decl. Ex. 109 (Sept.28, 1990 telex to Nagshineh).)  In a telex to Siavash Naghshineh, Karjooravary stated that Badr Taleh did not see any problem with the transfer of Assa directly to Bank Melli, and that Badr Taleh's "understanding has always been that the ownership of the mother company [Assa Corp.] was with Bank Melli."  (<u>Id.</u>).

On May 16, 1991, the board of the Mostazafan Foundation held a meeting in Zurich, Switzerland, to discuss the composition of the board.  (Government's SOF ¶ 61; McReynolds Decl. Ex. 77 (May 16, 1991 Farsi Board Minutes).)  Mohsen Rafighdoost, a director of the Foundation, also attended the meeting.  (Id.) Rafighdoost explained that the changes in board composition were "as directed by the Supreme Leader [the Ayatollah]," and instructed several board members to resign.  (Id.)  The Farsi minutes (unlike those in English) show that the attendees also discussed the Foundation's charitable activities and payment of partnership distributions to Assa.  (Compare McReynolds Decl. Exs. 77 (Farsi Board Minutes) & 78 (May 16, 1991 English Board Minutes).)  The English minutes do not reflect that Rafighdoost was present or that the board resignations had been directed by the Ayatollah.  (Id.)[22]

### D. Alavi's Interactions with Iranian Officials in the Early 1990s

Badr Taleh, now Executive Director of the Mostazafan Foundation, wrote a letter to the Ayatollah stating that Ambassador Kamal Kharrazi had told him that going forward, the Foundation would be under the Ambassador's oversight and not that of the Bonyad Mostazafan.  (Government's SOF ¶ 63; McReynolds Decl. Ex. 80 (May 31, 1991 letter from Badr to Ayatollah).)  In that same letter to the Ayatollah, Badr-Taleh stated the although the Ambassador's "appointment to a position of

---

[22] A shell company known as Harter Holdings owned Assa Ltd. from 1990 to 1998.  (Alavi and 650 Fifth Ave. Co.'s Memorandum of Law in Opp. to Gov't's Mot. for Summ. J. at 4 – 6; Ruzumna Decl. Ex. 22 – 24 (1993 – 1995 Annual Returns of Harter Holdings Ltd.).)  From 1993 to 1995, Bank Melli Iran directly owned 98% of Harter Holdings.  (Id.)  After 1995, Harter Holdings continued to own Assa Ltd., but nominal ownership was transferred from Bank Melli to Davood Shakeri and Fatemeh Aghamiri.  (Ruzumna Decl. Ex. 25 (1996 Annual Return of Harter Holdings Ltd.).)  Following the transfer to Shakeri and Aghamiri, Assa was nonetheless placed on the SDN list as a front for Bank Melli.

responsibility connected to the Foundation's affairs presents enormous political, security, and economic dangers, we feel assured that the Supreme Leader has made this decision with discernment, unique insight, and a thorough knowledge of all pertaining aspects."  (Government's SOF ¶ 64; McReynolds Decl. Ex. 80.)

In May 1991, three of the Foundation's board members, including Badr Taleh as the president, wrote to the Ayatollah that they would resign pursuant to his instructions, which Rafighdoost had conveyed to them.  In this letter, the board members wrote that they had succeeded in "protecting and expanding the Foundation's interests which in truth belongs [sic] to the people of Iran." (Government's SOF ¶ 60; McReynolds Decl. Ex. 76 (May 7, 1991 letter to Ayatollah).)  They also stated that they had been "also able to successfully carry out cultural and Islamic activities in the country of the Great Satan which faced an excessive void in the area of Islamic teachings due to the non-representation of the Islamic Republic of Iran."  (Id.)

In June 1991, the Iranian Ambassador, Kharrazi, informed Alavi's president, Badr Taleh, that Kharrazi was the representative of the Ayatollah and that all Iranian entities in the United States were under his control.  (Government's SOF ¶ 58; McReynolds Decl. Ex. 79 (June 3, 1991 letter from Badr).)

By August 1992, the Mostazafan Foundation of New York had been renamed "Alavi Foundation of New York."  In August 1992, Alavi and Bank Melli officials met in Tehran, Iran, and discussed 650 Fifth Ave. Co's (the partnership's) need for a $1.7 million loan and the partnership's debt to Assa Corp. of $2.2 million.

(Government's SOF ¶ 41; McReynolds Decl. Ex. 83 (Aug. 27, 1992 Foundation meeting minutes).)  Mohammed Geramian attended for the Foundation, and Karjooravary, Rahi, Naghshineh and Mohsen Ghadimipour attended for Bank Melli.  (Id.)

In this meeting, Naghshineh reiterated the history of the 650 Fifth Ave. Co. partnership, including the fact that the Foundation had entered into the partnership to save the Foundation from a substantial tax liability.  (Id.) Naghshineh affirmed Bank Melli's commitment to stand by Alavi and to approve the loan if Alavi adopted a specific plan to pay the debt owed to Assa.  (Id.)

On August 25, 1992, Asadollah Amir Aslani, the Chairman of the Board of Bank Melli, reported on the August 1992 meeting to Rafighdoost.  (Government's SOF ¶ 43; McReynolds Decl. Ex. 85 (Aug. 25, 1992 letter from Aslani to Rafighdoost).)  Aslani stated that Alavi was in partnership with Bank Melli in their ownership of the Building and reviewed the partnership's financial troubles; he concluded by stating that he hoped that Rafighdoost's "firm instructions" and the extra attention of the Alavi Foundation would resolve the partnership's problems. (Id.)

E.  Reinvestment in the Building and Building Revenues and
       Payments

From 2002 to 2008, approximately $75,911,609 was put back into the Building for expenses such as, inter alia, maintenance, insurance, repairs, and taxes.  (Government's SOF ¶ 88; McReynolds Decl. Exs. 51, 56 (Alavi Tax Returns, 650 Fifth Ave. Co. Tax Returns)).  From 2002 to 2007, the 650 Fifth Ave. Co. spent

approximately $3,492,567.00 for expenses incurred by Alavi, which includes, <u>inter alia</u>, compensation of officers, other employees' salary/wages, pension plans, and employee benefits.  (<u>Id.</u>)

From 1999 to 2007, Alavi received $38,936,220.00 from the 650 Fifth Avenue Building.  (<u>Id.</u>)

Alavi made distribution payments to Assa as manager of the 650 Fifth Avenue Co.  (<u>See, e.g.</u>, McReynolds Decl. Exs. 96, 97 (checks from Assa Corp. to Assa Ltd. dated August 18, 2004 and March 9, 2004).)

Alavi as manager of the 650 Fifth Avenue Co. made distribution payments to Assa quarterly until December 1, 2008 — days before the forfeiture action was filed and a protective order directed Alavi and Assa to submit the partnership distribution payments to the custody of the U.S. Marshal.  (<u>See</u> Government's SOF ¶ 56; McReynolds Decl. Ex. 51 (tax returns of Alavi Foundation).)  Assa Corp. also conveyed millions of dollars through international transfers to Assa Ltd.  (<u>See</u> McReynolds Decl. Exs. 96, 97 (checks from Assa Corp. to Assa Ltd. dated August 18, 2004 and March 9, 2004).)  Assa Corp. served as a conduit for Assa Ltd.: Assa Corp. received distributions from Alavi, held and protected those funds, and distributed those funds internationally to Assa Ltd.  (<u>Id.</u>)

F.  <u>Civil Lawsuits Against Alavi</u>

In September 1992, the first of what would become a large number of civil lawsuits was filed against the Foundation.  <u>Gabay v. Mostazafan Found.</u>, 92 Civ. 6954 (KMW).  (Government's SOF ¶ 72; McReynolds Decl. Ex. 62 (<u>Gabay</u> Compl.).)

24

Gabay sought to recover damages from the Iranian Government's alleged expropriation of assets located in Iran.  In an affidavit and at a deposition, Geramian denied that the Foundation was the agent or instrumentality of Iran, and claimed that the Foundation had not received instructions from any person or entity in Iran.  (Government's SOF ¶ 73 – 74; compare McReynolds Decl. Exs. 63 (Geramian Gabay Affidavit), 65 (Geramian Gabay Deposition) with, e.g., McReynolds Decl. Ex. 72 – 75 (correspondence between Geramian and Bonyad Mostazafan), 83 (Aug. 27, 1992 Foundation meeting minutes).)  Houshang Ahmadi, who had previously tendered his resignation from the board of the Foundation to the Ayatollah, also testified that he did not receive instructions from any person or entity in Iran as director of the New York foundation.  (Government's SOF ¶ 74; McReynolds Decl. Ex. 64 (Ahmadi Gabay Deposition).)  In November of 1992, Geramian was also corresponding with Mahmoud Asgari, supervisor of the Alavi agency office in Tehran, and the Bonyad Mostazafan legal office, regarding the Gabay litigation.  (Government's SOF ¶ 75; McReynolds Decl. Exs. 72 – 75.)  The Gabay case was dismissed in 1997 because the court determined that Gabay had failed to show that the Bonyad Mostazafan exercised day-to-day control over the Foundation, as it held would be necessary under the Foreign Sovereign Immunities Act ("FSIA").  Gabay v. Mostazafan Found. of Iran, 968 F. Supp. 895, 899 (S.D.N.Y. 1997).

On December 29, 1993, Bank Melli's Overseas Network Supervisory Department ("ONSD") wrote to the head of Bank Melli's New York office expressing

concern that the Assa director's affiliation with the Bank might be discovered. (Government's SOF ¶ 45; McReynolds Decl. Ex. 38 (Dec. 29, 1983 ONSD correspondence).)  The letter asked that an inquiry be made into whether "Mr. Naghshineh — the Assa Corp. New York Director whose affiliation with the Bank could easily be proven — could be replaced with another individual whose affiliation with the Bank could not be easily proven."  (Id.)

In June 1994, the ONSD asked Karjooravary whether the U.S. banking laws applied to Bank Melli Iran.  ONSD wrote that "the New York Agency [of Bank Melli], which is a bank branch registered in the U.S. and naturally subject to the banking laws and other current U.S. regulations, is not the owner of Assa Corporation.  In fact, Bank Melli Iran, which belongs to the Islamic Republic of Iran and is naturally not subject to current U.S. laws, is the owner of Assa Corporation through two other companies."  (Government's SOF ¶ 47; McReynolds Decl. Ex. 40 (June 25, 1994 letter from ONSD to Karjooravary).)  The ONSD asked the New York office to "estimate the percentage of risk of the seizure of these properties in case of the revelation of ownership by Assa Corporation."  (Id.)

On July 21, 1994, Karjooravary wrote, "Since last year, following a complaint registered by a person named Morad Gaby [sic] against the partnership's partner and one in which the partnership's building had been mentioned, it seems that management has declared that all the partnership's affairs be handled by a different entity other than this Agency."  (Government's SOF ¶ 46; McReynolds Decl. Ex. 39 (July 21, 1994 letter from Karjooravary to Khajeh Pour).)

G. Sanctions Against Iran

On June 1, 1995, the President of the United States determined Bank Melli to be "owned or controlled by the Government of Iran."  (Government's SOF ¶ 92.) See Implementation of Exec. Order No. 12959 With Respect to Iran, 60 Fed. Reg. 40881 (Aug. 10, 1995), available at 1995 WL 469997.  On October 25, 1997, Bank Melli was designated by the Office of Foreign Assets Control ("OFAC") pursuant to Executive Order 13,382, for, inter alia, providing banking services to Iran's Revolutionary Guard Corps ("IRGC") and the IRGC Qods Force.  (Government's SOF ¶ 94.)  See Additional Designation of Entities Pursuant to Executive Order 13382, 72 Fed. Reg. 62520, (Nov. 5, 2007), available at 2007 WL 3235014.  On that same day, Bank Melli and all of its offices worldwide were added to the Specially Designated Nationals ("SDN") list.  (Government's SOF ¶ 95; VAC ¶ 18; Alavi & 650 Fifth Ans. ¶ 18, 47, 48.)

H. The Partnership in the Early 2000s

Bank records demonstrate that Assa Corp. transferred millions of dollars to Assa Co. Ltd. in, inter alia, 2002, 2003 and 2004 through checks that originated in the U.S. and were mailed to Assa in the UK.  (Government's SOF ¶ 57; McReynolds Decl. Exs. 94 – 96 (Assa checks).)

From 1996 to 2008, Assa was represented in the U.S. by one employee, Mohammed Hassan Dehghani Tafti.  (Government's SOF ¶ 53.)  Tafti and Bank Melli officials exchanged a number of emails between February and August 2005 discussing Assa's business affairs, including regarding the residence of the two

27

purported then-owners of Assa Co. Ltd., Davood Shakeri and Fatemeh Aghamiri, residents of Iran.  (Government's SOF ¶ 54; McReynolds Decl. Exs. 44 – 49 (emails between Tafti and Bank Melli officials).)    Each purportedly owns 50% of Assa Co. Ltd.'s shares.  (Government's SOF ¶ 51; VAC ¶ 47; Assa Ans. ¶ 47, ECF No. 182.)

Jahedi became president of the Foundation in 2007.  In October 2007, Jahedi met with Khazaee at the Ambassador's residence and discussed issues relating to the Building's management and the Foundation's charitable services. (Government's SOF ¶ 68–69; McReynolds Decl. 86 (Jahedi notes).)  Ali Ebrahimi, who had been a member of the Foundation's board and its secretary since 1992, also attended the meeting.  (Id.)  Jahedi's notes reflect that the Ambassador instructed that he would determine the composition of the Alavi board, that the profitability of the Building had to improve, and that the Foundation should only allocate to Shiites.  (Id.)[23]  The Ambassador also stated, "I have to definitely see the proposed allocations before a final decision is reached.  I have to be kept informed and I have to be able to state my opinion in order for you to make a decision."  (Id.)  Ebrahimi's notes reflect that he and Jahedi also discussed the topics of Bank Melli's "40% share" and increasing the board.  (Government's SOF ¶ 69; McReynolds Decl. Ex. 41 (Ebrahimi notes).)[24]

On December 17, 2008, Assa Corp. and Assa Co. Ltd. were added to the SDN list.  (Government's SOF ¶ 95; VAC ¶ 18; Assa Ans. ¶ 18.)

---

[23] Jahedi's notes are not subject to a hearsay objection: they are a business record of Alavi, a present sense impression, and an admission of a party opponent. Because Jahedi is unavailable, his notes are also admissible as a statement against interest under Fed. R. Civ. P. 804(b)(3).
[24] As set forth below, Ebrahimi invoked his Fifth Amendment privilege against self-incrimination at his deposition in this matter on June 26, 2013.

I.   Litigations Against Claimants

In addition to the Gabay action, the following civil litigations were filed against Claimants:

1. Flatow v. Islamic Republic of Iran, 67 F. Supp. 2d 535 (D. Md. 1998).[25]

2. Greenbaum et al. v. Assa Corp. et al., No. 117226/08 (N.Y. Sup. Ct. N.Y. Cty. Dec. 24, 2008)

3. Rubin et al. v. Alavi Found. et al., No. 100259/09 (N.Y. Sup. Ct. N.Y. Cty. Jan. 8, 2009)

4. Miller et al. v. Alavi Found. et al., No. 09 Civ. 166 (KBF) (S.D.N.Y. Jan. 8 2009)

5. Rubin et al. v. Alavi Found. et al., No. 09 Civ. 165 (KBF) (S.D.N.Y. Jan 8, 2009).

6. Greenbaum et al. v. Assa Corp. et al., No. 09 Civ. 553 (KBF) (S.D.N.Y. Jan. 20, 2009)

7. Greenbaum et al. v. Assa Corp. et al., No. 09 Civ. 564 (KBF) (S.D.N.Y. Jan. 21, 2009)

8. Rubin et al. v. Alavi Found. et al., No. 09 Civ. 4614 (KBF) (S.D.N.Y. May 15, 2009)

9. Rubin et al. v. Alavi Found. et al., No. 09 Civ. 4784 (KBF) (S.D.N.Y. May 21, 2009)

---

[25] In Flatow, the court quashed the plaintiff's writs of execution pursuant to the Foreign Sovereign Immunities Act ("FSIA") against properties owned by the Alavi Foundation on the grounds that the then-existing record did not support a finding that Alavi was an agent, alter ego, or instrumentality of the Iranian government.

10. <u>Peterson et al. v. 650 Fifth Ave. Co. et al.</u>, No. 10 Civ. 1627 (KBF) (S.D.N.Y. Mar. 1, 2010)

11. <u>Acosta et al. v. Assa Corp. et al.</u>, No. 10 Civ. 2464 (KBF) (S.D.N.Y. Mar. 18, 2010)

12. <u>Hegna et al. v. Islamic Republic of Iran et al.</u>, No. 11 Civ. 3761 (KBF) (S.D.N.Y. June 2, 2011)

13. <u>Beer et al. v. Islamic Republic of Iran et al.</u>, No. 12 Misc. 20 (KBF) (S.D.N.Y. Jan. 23, 2012)

14. <u>Beer et al. v. Islamic Republic of Iran et al.</u>, No. 12 Misc. 21 (KBF) (S.D.N.Y. Jan. 23, 2012)

15. <u>Kirschenbaum et al. v. Islamic Republic of Iran et al.</u>, 12 Misc. 19 (KBF) (S.D.N.Y. Jan. 23, 2012)

16. <u>Kirschenbaum et al. v. Islamic Republic of Iran et al.</u>, 12 Misc. 22 (KBF) (S.D.N.Y. Jan. 23, 2012)

17. <u>Estate of Michael Heiser et al v. 650 Fifth Avenue Company et al.</u>, No. 13 Misc. 71 (KBF) (S.D.N.Y. Feb. 27, 2013)

18. <u>Kirschenbaum et al v. ASSA Corporation et al.</u>, No. 13 Civ. 1825 (KBF) (S.D.N.Y. Mar. 19, 2013)

19. <u>Beer et al. v. Islamic Republic of Iran et al.</u>, No. 13 Civ. 1848 (KBF) (S.D.N.Y. Mar. 20, 2013)

J. <u>Alavi's Board</u>

The members of the Alavi Foundation's Board were and are:

1. Houshang Ahmadi (1980 – 2013) (also the current president of Alavi);

2. Mohammad Pirayandeh (1983 – 2005);

3. Mehdi Hodjat (1991 – 2005);

4. Abbas Mirakhor (1991 – 2005);

5. Alireza Ebrahimi (1993 – 2013);

6. Ali Afshar (2005 – 2006);

7. Ali Dabiran (2005 – 2013);

8. Hassan Hassani (2005 – 2013);

9. Mohammad Geramian (served as President of Alavi Foundation from 1991 – 2007); and

10. Farshid Jahedi (served as President of Alavi Foundation from 2007 – 2009).

The current members and presidents of the Board of Alavi listed above span the entire continuous period in question, from 1980 (when Ahmadi became a member) to the present.  Thus, Ahmadi and the other members individually, as well as the Board collectively, knew that Assa was controlled by Iran at the outset and retained this knowledge until the lawsuit against Alavi was filed.  This is particularly important in relation to Alavi's assertion that after 1995 there is a triable issue as to whether, when it provided services to Assa and managed the partnership and Building daily for Assa, it knew it was in fact providing these services to Bank Melli and the Government of Iran.  Ahmadi and Pirayandeh were directors when the Foundation and Bank Melli conceived of the Assa companies as straw companies behind which Bank Melli was the true owner and exerted control.

Other directors, including Hodjat, Mirakhor, and Ebrahimi, were present during many of the events in the 1990s involving the Foundation and Bank Melli recited above.  Thus, Alavi's argument that between 1995 and 2008 these very same people, in whose files the documents referred to existed, "forgot" who Assa really was, or "assumed" a significant change had occurred, is a tale no rational juror could believe (particularly since all but one director to be called at trial has "taken the Fifth" — and the remaining director, Mirakhor, concedes that he spent his time in Washington, D.C. and that the other members of the board knew more).

K.  Alavi's Management Role

During the period from 1989 through 2008 when this action was filed, Alavi played an active role in managing the Building.  In doing so, it collected substantial fees from the 650 Fifth Ave. Co. for its services.  (Government's SOF ¶ 88; McReynolds Decl. Ex. 51, 56 (Alavi tax returns, 650 Fifth Ave. Co. tax returns).) These management fees were used to pay a portion of the salaries of Alavi's president, controller and secretary for their work on behalf of the 650 Fifth Ave. Co. (Id.)  The last management fee was paid by the partnership (and therefore by Assa, to the extent of its pro rata interest) on or about December 1, 2008.  (Id.)  Alavi also received hundreds of thousands of dollars annually through 2007 from the 650 Fifth Ave. Co. for expenses incurred by the Foundation in connection with the services rendered to the partnership by the employees of the Foundation.  (Id.)

The Foundation has also entered into contracts with third parties to manage the Building on October 1, 2007. (Government's SOF ¶ 89; McReynolds Decl. Ex. 107 (Management Agreement).)

L. <u>Events Surrounding the Forfeiture Action</u>

This action was commenced against the assets of Assa on December 17, 2008. On December 17, 2008, Farshid Jahedi, as president of Alavi, was served with a grand jury subpoena to provide testimony in a criminal investigation. (Government's SOF ¶ 82; McReynolds Decl. Ex. 67 (Esposito deposition transcript).) The grand jury subpoena required that Alavi provide any and all documents relating to the 650 Fifth Ave. Co., the Alavi Foundation, and Assa. (Government's SOF ¶ 82; McReynolds Decl. Ex. 66 (grand jury subpoena).) On December 18, 2008, FBI personnel conducting surveillance of Jahedi saw him throwing papers in a public trash receptacle. (Government's SOF ¶ 83; McReynolds Decl. Ex. 68 (surveillance report).) The FBI retrieved and reconstructed the documents; they were responsive to the grand jury subpoena. (Government's SOF ¶ 83; McReynolds Decl. Ex. 69 (photos of responsive grand jury documents torn by Jahedi).) On December 19, 2008, Jahedi was charged in a criminal complaint; he was subsequently indicted for obstruction of justice. (Government's SOF ¶ 84; McReynolds Decl. Ex. 70 (Indictment).) On December 30, 2009, Jahedi pled guilty. (Government's SOF ¶ 84; McReynolds Decl. Ex. 71 (Jahedi plea allocution).)

Today, the two purported owners of Assa Co. Ltd. are Shakeri and Aghamiri; but there is no cognizable evidence in the record suggesting independence from

Bank Melli, and there is evidence suggesting the opposite.[26]  After they refused to appear at court-ordered depositions at the American consulate in Dubai, the Court imposed Rule 37 sanctions in the form of an adverse inference against them.  The Court also strikes the declaration submitted by Davood Shakeri in opposition to this motion, as he was never made available for any type of cross-examination and, in light of his failure to follow the court's order and submit to deposition, he may not testify live at trial.  Accordingly, his declaration constitutes incurable hearsay.[27]

This Court therefore assumes that the testimony that Shakeri and Aghamiri would have given to material issues in this case, including whether Assa Co. Ltd. is in fact owned entirely by Bank Melli and whether they act on Bank Melli's behalf, whether proceeds of partnership distributions made to Assa Co. Ltd. have been made to Bank Melli, and whether they have participated in hiding the true ownership of Assa, would have been unhelpful to their position.  Put another way, the Court assumes that the testimony these individuals would have given on these topics would have further supported the Government's case.

The following Alavi board members or former board members asserted their Fifth Amendment right against self-incrimination in their depositions in this

---

[26] Furthermore, there are numerous ongoing references over time to Bank Melli's continued 40% interest in Assa.  (See, e.g., Government's SOF ¶ 68–69; McReynolds Decl. 86 (October 2007 Jahedi meeting notes).)  Assa's presence on the SDN list as a front for Bank Melli — which dated from 2008, when Shakeri and Aghamiri had purportedly been Assa's owners since 1995 — also indicates that Assa is itself Iranian.

[27] Shakeri submitted a declaration in opposition to this motion.  (ECF No. 445.)  That declaration constitutes incurable hearsay and is not properly considered on summary judgment.  See ABB Indus. Sys., Inc. v. Prime Tech., Inc., 120 F.3d 351, 357 (2d Cir. 1997) (ruling that hearsay would "be inadmissible at trial and cannot create at triable issue of fact" on summary judgment).  Shakeri violated court orders to appear for deposition (ECF No. 563, 586) and has been precluded from testifying at trial.  ECF No. 831.)  (There has been no indication or proffer that he would enter U.S. territory to testify at trial even if he would not enter the U.S. consulate in Dubai for deposition, so preclusion is academic.)

matter: Hassan Hassani (2005 – 2013), Ali Dabiran (2005 – 2013), Alireza Ebrahimi (1993 – 2013), Mohammad Geramian (served as President of the Foundation from 1991 – 2007) and Farshid Jahedi (served as President of the Foundation from 2007 – 2009).  Abbas Mirakhor (1991 – 2005) testified at his deposition that when he was on the board of the Foundation he was not acting on behalf Iran and did not believe the board was acting on behalf of Iran.  (Ruzumna Decl. in Supp. of Claimants' Mot. for Summ. J. Ex. 5 (Mirakhor Dep. 66:10 – 66:15).)[28]  Mirakhor also testified that he worked in Washington, D.C. at the time and that "the members of the board, and particularly the president, were far more informed about what was going on than [he] was."  (Ruzumna Decl. Ex. 5 (Mirakhor Dep. 41:19 – 42:13; 57:11 – 57:25; 202:24 – 202:25).)

Neither Assa nor Alavi has received a license from OFAC to provide services to Iran.  (Government's SOF ¶ 96; Alavi Ans. ¶ 23; Assa Ans. ¶ 23.)

III.   STANDARD ON SUMMARY JUDGMENT

Summary judgment may not be granted unless the movant shows, based on admissible evidence in the record placed before the court, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S.

---

[28] In a civil case, a court may, but need not, draw an adverse inference based on a witness's assertion of his Fifth Amendment privilege.  See, e.g., Libutti v. United States, 107 F.3d 110, 121 (2d Cir. 1997) (the Fifth Amendment "'does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them'" (quoting Baxter v. Palmigiano, 425 U.S. 308, 318 (1976))).  Here, the Court finds the record evidence so overwhelming that it need not.  Moreover, by asserting their Fifth Amendment rights, these individuals left the record devoid of evidence supportive of Alavi's position on this motion.

317, 323 (1986).  In making a determination on summary judgment, the court must
"construe all evidence in the light most favorable to the nonmoving party, drawing
all inferences and resolving all ambiguities in its favor."  Dickerson v. Napolitano,
604 F.3d 732, 740 (2d Cir. 2010).

Once the moving party has asserted facts showing that the non-movant's
claims cannot be sustained, the opposing party must set out specific facts showing a
genuine issue of material fact for trial.  Price v. Cushman & Wakefield, Inc., 808 F.
Supp. 2d 670, 685 (S.D.N.Y. 2011); see also Wright v. Goord, 554 F.3d 255, 266 (2d
Cir. 2009).  "[A] party may not rely on mere speculation or conjecture as to the true
nature of the facts to overcome a motion for summary judgment," as "[m]ere
conclusory allegations or denials . . . cannot by themselves create a genuine issue of
material fact where none would otherwise exist."  Hicks v. Baines, 593 F.3d 159,
166 (2d Cir. 2010) (citations omitted); see also Price, 808 F. Supp. 2d at 685 ("In
seeking to show that there is a genuine issue of material fact for trial, the non-
moving party cannot rely on mere allegations, denials, conjectures or conclusory
statements, but must present affirmative and specific evidence showing that there
is a genuine issue for trial.").

Only disputes relating to material facts — i.e., "facts that might affect the
outcome of the suit under the governing law" — will properly preclude the entry of
summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see
also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)
(stating that the nonmoving party "must do more than simply show that there is

36

some metaphysical doubt as to the material facts").  Evidence presented by the non-moving party that is so "blatantly contradicted by the record . . . that no reasonable jury could believe it" should not be accepted by the court for purposes of defeating a motion for summary judgment.  <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007); <u>Zellner v. Summerlin</u>, 494 F. 3d 344, 371 (2d Cir. 2007) ("Incontrovertible evidence relied on by the moving party . . . should be credited by the court on [a summary judgment] motion if it so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party.").

IV.   <u>BURDEN OF PROOF</u>

In this civil forfeiture action, the Government bears the burden of proof with respect to establishing each of the elements required to demonstrate a violation of either of its two theories of forfeitability: (1) violations of the IEEPA or (2) the anti-money laundering statutes.  18 U.S.C. § 983(c) (2009).  On a motion for summary judgment, the Government can only prevail if it demonstrates that there is no triable issue of fact with respect to those required elements.

Even if the Government carries this burden, however, forfeiture is not certain.  Putting aside issues relating to what property would then be subject to forfeiture (and assuming <u>arguendo</u> that some property would be), the burden then shifts to the Claimant to show a triable issue as to whether it was an "innocent owner."  <u>United States v. Funds Held in the Name or for the Benefit of Wetterer</u>, 210 F.3d 96, 104 (2d Cir. 2000).  "Once the government establishes that there is probable cause to believe that a nexus exists between the seized property and the

predicate illegal activity, the burden shifts to the claimant to show by a preponderance of the evidence (1) that the defendant property was not in fact used unlawfully, or (2) that the predicate illegal activity was committed without the knowledge of the owner-claimant, that is, that the claimant is an innocent owner." Id. (citing 18 U.S.C. § 981(a)(2)) (citation and internal quotation marks omitted).  As discussed further below, willful blindness to the violations will also bar the innocent owner defense.  See United States v. One Parcel of Prop., Located at 755 Forest Rd., Northford, Conn., 985 F.2d 70, 72 (2d Cir. 1993).

As stated at the outset of this decision, despite their burden to do so, no Claimant raised the innocent owner defense in its opposition papers on this motion. See Johnson v. Board of Regents of Univ. of Ga., 263 F.3d 1234, 1264 (11th Cir. 2001) ("Intervenors cannot readily complain about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of the summary judgment motions."); Frankel v. ICD Holdings S.A., 930 F. Supp. 54, 64 (S.D.N.Y. 1996) (the fact that the defendants were "entitled" to raise a defense "does not mean that they have done so in a manner sufficient to defeat plaintiffs' motion for summary judgment"); Dollar Dry Dock Savings Bank v. Hudson St. Dev. Assocs., No. 92 Civ. 3737 (SAS), 1995 WL 412572, at *5 (S.D.N.Y. July 12, 1995) (explaining that the burden is on the defendant to adduce evidence supporting affirmative defense, not upon the movant to negate its existence); Harper v. Delaware Valley Broadcasters, Inc., 743 F. Supp. 1076, 1090 – 91 (D. Del. 1990, aff'd, 932 F.2d 959 (3d Cir. 1991) (same); Security

<u>Pac. Mortg. & Real Estate Servs., Inc. v. Canadian Land</u>, 690 F. Supp. 1214, 1219
(S.D.N.Y. 1988), <u>aff'd</u>, 891 F.2d 447 (2d Cir. 1989) ("The requirements of pointing to
specific contested facts in opposing a motion for summary judgment are particularly
elevated where the nonmoving party would bear the burden of proof at trial on [an]
affirmative defense . . . ."). Nevertheless, the Court has undertaken the exercise of
scouring the record on this motion to determine whether there is a triable issue of
fact as to whether any Claimant is an innocent owner. As discussed below in
several places, there is not.

    A.    <u>The Role of "Knowledge" in the Burden of Proof</u>

On this motion, the Government bears the burden of showing an absence of
triable fact as to violations of IEEPA and the money laundering statute. To the
extent "knowledge" is an element of a violation, the Government must demonstrate
no triable issue of fact as to that element. For instance, if the essential claim is that
Assa and/or Alavi are controlled by Iran and therefore their acts are services to
Iran, that claim would involve an element of knowledge. Knowledge is explicitly an
element of the money laundering violations asserted.

In order to avoid forfeiture of assets for this violation, Claimants thus bear
the burden of raising a triable issue as to their <u>lack</u> of knowledge or <u>lack</u> of willful
blindness with respect to the unlawful conduct (<u>i.e.</u>, money laundering and IEEPA
violations). 18 U.S.C. § 983(d)(2)(A) (an "innocent owner" is a defense to forfeiture,
but a party asserting such a defense cannot have knowledge of conduct giving rise
to the offense); 18 U.S.C. § 983(d)(3)(A) (an "innocent owner" must not have known

or had reasonable cause to believe that the property was subject to forfeiture); see also von Hofe v. U.S., 492 F.3d 175, 180 (2d Cir. 2007); United States v. $557,933.89, More or Less, in U.S. Funds, 287 F.3d 66, 77 (2d Cir. 2002); Jury Instructions, United States v. 777 Greene Ave. et al., 05 Civ. 0047 (E.D.N.Y. 2008) (Gleeson, J.).

Alavi has failed to raise a triable issue on this question.  As set forth below, there is simply no way to erase the stark fact that Alavi was present at the creation and birth of Assa (its midwife): along with Bank Melli, it directly participated in the plan to create Assa as a company (in fact, two companies — a U.S. Assa and a Channel Islands Assa) to act on behalf of Bank Melli.  (See, e.g., Government's SOF ¶ 30; McReynolds Decl. Ex. 31 (Aug. 19, 1989 letter from Khojasteh to Bagherian).)

Alavi has not disputed the content of numerous documents in which Bank Melli is referred to as "owned or controlled by the Government of Iran." (Government's SOF ¶ 92; Implementation of Executive Order No. 12959 With Respect to Iran, 60 Fed. Reg. 40881 (Aug. 10, 1995), available at 1995 WL 469997; Government's SOF ¶ 93; Iranian Transactions Regulations: Implementation of Executive Order 13059, 64 Fed. Reg. 20168 (Apr. 26, 1999), available at 1999 WL 237703.)  Alavi's own documents are replete with references to board members' awareness of the decision-making authority of the Ayatollah over the composition of the Foundation's board, of the role that the Iranian Ambassador was to play in the Foundation's business with respect both to the Building and its charitable activities.

(See, e.g., Government's SOF ¶ 61; McReynolds Decl. Ex. 77 (May 16, 1991 Farsi Board Minutes).)

Alavi argues that the Government "has offered no evidence to support the proposition that Bank Melli Iran since 1995 controlled Assa, Ltd." (See Alavi & 650 Fifth Avenue's Memorandum of Law in Opp. to Gov't's Mot. for Summ. J. at 6.) This statement is carefully worded. Alavi does not offer affirmative evidence that raises a triable issue with respect to whether Bank Melli Iran had taken actions to sever its ultimate control — through intermediaries — of Assa. (The evidence Alavi does proffer is set forth below.) Rather, Alavi argues that the Government bears a burden of demonstrating that after 1995 Bank Melli continued to control Assa. In fact, the Government has put forward such evidence. (See, e.g., Government's SOF ¶ 47; McReynolds Decl. Ex. 40 (June 25, 1994 letter from ONSD to Karjooravary).)

Finally, there can be no dispute that Assa was added to the SDN list — as controlled by Bank Melli — in December 2008. (Government's SOF ¶ 95; VAC ¶ 18; Alavi & 650 Fifth Ans. ¶ 18, 47, 48.) Thus, nine months prior to Alavi being added to the civil forfeiture complaint by the Government, Assa's relationship with Bank Melli was clear.

V.   THE IEEPA

The Government's first claim for forfeiture arises under 18 U.S.C. § 981(a)(1)(C), which subjects property to forfeiture based on its connection to violations of IEEPA. To determine whether there has been a violation of that statute involves several steps. The statute provides in relevant part:

41

(a)(1) The following property is subject to forfeiture to the United States:

(C) Any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.

18 U.S.C. § 981(a)(1)(C).

Thus, if property (1) either "constitutes . . . proceeds" or "is derived from proceeds" that are (2) traceable to (3) "specified unlawful activity," it is forfeitable.

A.    "Specified Unlawful Activity"

Section 1956(c)(7) of Title 18 defines "specified unlawful activity" to include offenses under "section 206 (relating to penalties) of the International Emergency Economic Powers Act."  18 U.S.C. § 1956(c)(7)(D).  The IEEPA was enacted in 1977 and empowers the President of the United States to employ economic sanctions and other measures in response to situations which he has declared to be national emergencies.  See 50 U.S.C. § 1702 (2001).

Section 206 of the IEEPA is codified at 50 U.S.C. § 1705 (2007), which provides:

It shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter.

50 U.S.C. § 1705(a).  Accordingly, whether Claimants have violated the IEEPA requires inquiry into whether there is evidence that they have violated an "order, regulation or prohibition" issued under § 1705, or attempted to do so or conspired with another to do so.  The statute does not contain an explicit intent requirement.

42

However, among the Government's theories of recovery is a conspiracy claim with respect to the alleged IEEPA violations, which would, of course, require an agreement between Alavi and Assa and/or Bank Melli to violate the IEEPA. Moreover, certain IEEPA violations (that Alavi knew that all of its services to Assa were services for Bank Melli and therefore Iran), also requires "knowing" who Assa is.[29]

The orders, regulations and prohibitions at issue in § 1705 are set forth in a series of presidential Executive Orders and regulations promulgated by the United States Department of Treasury as a direct result of these Executive Orders. The regulations have been referred to above, and are further discussed below, as the Iranian Transaction Regulations or "ITRs."

The first relevant Executive Order was issued on October 29, 1987, by President Reagan. In Executive Order 12613, he found that "that the Government of Iran is actively supporting terrorism as an instrument of state policy." Exec. Order 12613, 52 Fed Reg. 41940 (Oct. 29, 1987). President Reagan ordered that "no goods or services of Iranian origin may be <u>imported</u> into the United States, including its territories and possessions, after the effective date of this Order" and authorized the "Secretary of the Treasury . . . to take such actions, including the promulgation of rules and regulations, as may be necessary to carry out the

---

[29] On this motion, the Government could have, but did not, argue that Alavi was itself controlled directly or indirectly by the Government of Iran. Thus, the possible IEEPA violations of being "itself" controlled by Iran are not at issue on this motion. Issues regarding whether Alavi has actual, lawful charitable mission activities in which it may engage are therefore irrelevant to this motion; the Government has not asserted (nor need it to prevail) that "all" Alavi activities are controlled by Iran.

purposes of this Order." Id. (emphasis added).  None of the Claimants are alleged to have violated the importation prohibition set forth in Executive Order 12613. However, this Order led directly to the promulgation of several ITRs.

Pursuant to E.O. 12613, the U.S. Treasury Department's Office of Foreign Asset Control ("OFAC"), promulgated the first of its ITRs.  See 31 C.F.R. pt. 560, 52 Fed. Reg. 44076 (Nov. 17, 1987).  In addition to prohibiting various Iranian-origin imports, the ITR prohibited certain related transactions as follows:

> No person may order, buy, act as broker or facilitator for, receive, conceal, store, use, sell, loan, dispose of, transfer, transport, finance, forward, or otherwise service, in whole or in part, any goods or services subject to the prohibitions of this part, with knowledge or reason to know that a violation of this part, or any regulation, order, or license issued pursuant hereto or to Section 505 of the Act, has occurred, is about to occur, or is intended to occur with respect to such goods or services.

Iranian Transactions Regulations, 31 CFR § 560.202, 52 Fed. Reg. 44076 (Nov. 17, 1987).  The Government alleges that Assa and Alavi have violated these ITRs, as amended subsequent to 1987.  (VAC ¶ 148.)

On March 15, 1995, President Clinton issued the second Executive Order relevant to this action.  In Executive Order 12957, he found that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States" and "declare[d] a national emergency to deal with that threat." Exec. Order 12957, 60 Fed. Reg. 14615 (Mar. 15, 1995).

On May 6, 1995, President Clinton issued the third Executive Order relevant to this action: Executive Order 12959. See Exec. Order 12959, 60 Fed Reg. 24757

(May 6, 1995).  This Executive Order more broadly prohibited transactions involving export to, financing of, and investment in Iran.

In September 1995, pursuant to the IEEPA and Executive Orders 12957 and 12959, OFAC issued the ITRs most directly here at issue: those prohibiting a series of economic transactions relating to Iran.  In the order in which they appear in the statute, the ITRs at issue are:

(1) The amended version of 31 C.F.R. § 560.203, which prohibits:

Any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts   to violate, any of the prohibitions contained in this part . . . .[30]

(2)  31 C.F.R. § 560.204, which prohibits:

"[T]he exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran . . . including the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that:

(a) Such goods, technology, or services are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran . . . .

(3) 31 C.F.R. § 560.206, which provides that no American person or corporation "may engage in any transaction" or dealing in or related to:

(1) Goods or services of Iranian origin or owned or controlled by the Government of Iran; or

(2) Goods, technology, or services for exportation, reexportation, sale or supply, directly or indirectly, to Iran or the Government of Iran.

---

[30] The language of 31 C.F.R. § 560.203 has changed slightly since OFAC issued the ITRs in 1995, but the new language does not create a material difference on this motion.

(emphasis added).

(4) 31 C.F.R. § 560.207, which prohibits:

> [A]ny new investment by a United States person in Iran or in property (including entities) owned or controlled by the Government of Iran . . . .

(5) 31 C.F.R. § 560.208, which prohibits the facilitation of the provision assets or services to Iran in form of efforts to:

> [A]pprove, finance, facilitate, or guarantee any transaction by a foreign person where the transaction by that foreign person would be prohibited by this part if performed by a United States person or within the United States.

On August 19, 1997, President Clinton issued Executive Order 13059. This Executive Order prohibited a series of economic transactions related to Iran and the Iranian government that largely tracked the provisions of the ITRs just described. See Exec. Order 13059, 62 Fed. Reg. 44531 (Aug. 19, 1997).

## B.   The Government's Asserted IEEPA Violations

In the Verified Amended Complaint, the Government alleges violations of the IEEPA and ITRs 31 C.F.R. §§ 560.203, 560.204, 560.206, 560.207 and 560.208. (VAC ¶ 148.)

In substance, the Government alleges that Claimants acted individually, aided and abetted another, or conspired with one or more entities to violate the ITRs. In its submissions in support of this motion, the Government focuses on Claimants' provision of services to Iran.

The Government claims that Assa's entire existence is to provide services daily to act as a straw company to hide Bank Melli (and therefore the Government

46

of Iran's) true ownership interest in the Defendant Properties.  Assa's presence on the SDN list as a front for Bank Melli — which dated from 2008, when Shakeri and Aghamiri had purportedly been Assa's owners since 1995 — also indicates that it is itself Iranian and, therefore, all of its activities are performed in service to Iran.

As to Alavi, the Government claims that it has provided services to Assa by virtue of its position as managing partner of the 650 Fifth Ave. Co. partnership, and that in this capacity it has rendered services — namely, partnership and building management.  The Government also makes the broader claim that, in providing such services, Alavi knew for whom it was acting and that broadly speaking, Alavi's services to Assa were knowingly for Bank Melli and the Government of Iran; Alavi's services therefore include knowing concealment of Assa's true identity.

Thus, determining if there is a triable issue of fact as to whether Claimants have violated, attempted to violate, or conspired to violate the IEEPA (and its implementing ITRs) requires inquiry into what services (if any) have been provided to Iran, whether there is a triable issue as to knowledge, and whether Claimants acted alone, aided and abetted, or conspired in connection with the provision of such services.

The Court addresses the role of Iran vis-à-vis Assa first, as it is the threshold issue from which the remainder of the analysis follows.

1. <u>Iran</u>

The ITRs define the "Government of Iran" to include "[a]ny entity owned or <u>controlled directly or indirectly</u>" by the "the Government of Iran, as well as any

political subdivision, agency, or instrumentality thereof." 31 C.F.R. § 560.304 (emphasis added). Included in this definition are "any corporation, partnership, association, or other entity in which the Government of Iran owns a majority or controlling interest, and any entity which is otherwise controlled by that government." 31 C.F.R. § 560.313.

2.   Assa's Relationship to Iran

There is no triable issue of fact as to Assa's relationship to the Government of Iran: there is substantial, uncontradicted evidence that Assa is owned and controlled by Bank Melli, and that Bank Melli is wholly owned and controlled by Iran. As set forth in the recitation of facts above, there are many documents that leave no doubt that Assa began its existence as the brainchild of the Mostazafan Foundation — now Alavi — and Bank Melli; and there is no evidence that it ever made a break with its ultimate owner. (See, e.g., McReynolds Decl. Exs. 31 (Aug. 19, 1989 letter from Khojasteh to Bagherian), 109 (Sept. 28, 1990 telex to Nagshineh).)

That two individuals, Shakeri and Aghameri, are alleged to currently "own" Assa does not alter this result.[31]  Both individuals refused to be deposed in this action, and the Shakeri declaration purporting to set forth his position as owner has been struck as inadmissible hearsay. Thus, there is no record evidence disputing Bank Melli's ultimate ownership and control. The Court may, but does not even find it necessary to, draw an adverse inference as to what either Shakeri or

---

[31] As set forth below, this additional intermediary layer did not prevent the U.S. Treasury from placing Assa on the SDN list as a front for Iran in 2004.

Aghmeri would say about how they came to be owners, whether they are "real owners" or merely nominal owners, and whether they are acting in on behalf of the Government of Iran.  Nor need the Court rely on the adverse inference it could draw from the fact that Assa's only employee, Tafti, also refused to be deposed.  The evidence alone — apart from such inferences — is such that no rational juror could come to a contrary conclusion.

In addition, it is notable that Bank Melli was placed on the SDN list in 1997, that Assa was placed on the SDN list as an entity owned and controlled by Bank Melli in 2008 (after Shakeri and Aghamiri's entrance on the scene), and that Assa has not sought to contest such designation in the years since it was so designated.  See Press Release, Treasury Designates Bank Melli Front Company in New York City, U.S. Dep't of Treasury, Dec. 17, 2008; Additional Designation of Entities Pursuant to Executive Order 13382, 73 Fed. Reg. 80513 (Dec. 31, 2008).  The facts underlying such designation, provided that the listed entity had an opportunity to contest the administrative determination, are entitled to deference.  See Consarc Corp. v. Iraqi Ministry, 27 F.3d 695, 702 (D.C. Cir. 1994) (citing Chevron, U.S.A., Inc. v. NRDC, 467 U.S. 837, 844 – 45 (1984)).

Accordingly, the IEEPA violation element is established as to Assa.

3.    Alavi's Relationship to Iran

Alavi concedes — as it must — that it is the managing partner of the 650 Fifth Ave. Co. partnership.  (See, e.g., McReynolds Decl. Ex. 37 (Partnership Agreement 7–8).)  Thus, based on the fact that Assa is controlled by Bank Melli and

therefore controlled by Iran (and effectively "is" the Government of Iran), there is no triable issue as to Alavi's relationship to Iran: it has been acting as a service provider.

C.    "Services"

The functions performed by Alavi and Assa for Iran clearly constitute "services" for the purposes of the ITRs and IEEPA.  The ITRs themselves do not define the term "services."  The Second Circuit has stated that "[t]he term 'services' is unambiguous and refers to the performance of something useful for a fee." United States v. Homa Int'l Trading Corp., 387 F.3d 144, 146 (2d Cir. 2004) (citing United States v. All Funds on Deposit in United Bank of Switzerland, No. 01 Civ. 2091 (JSR), 2003 WL 56999, at *1 (S.D.N.Y. Jan. 7, 2003) (finding that "services" "carries its ordinary legal meaning") (citing Black's Law Dictionary 1372 (7th ed. 1999) (defining "service" as "the act of doing something useful for a person or company for a fee"))).

1.    Assa's Provision of Services

Assa has no business other than owning its 40% interest in the 650 Fifth Ave. Co.  The services that Assa provided to Iran are clear: it has acted as a front to conceal Bank Melli's 40% ownership of the 650 Fifth Ave. Co.  Assa has managed Bank Melli and therefore Iran's minority ownership in the assets at issue, and it has enabled Bank Melli to receive substantial revenues generated through the assets.

50

There is no triable issue that Assa received value for its services: first, at a most basic level, its president, Tafti, was paid with revenues generated by Iran's indirect ownership of the Building.  More importantly, because Assa effectively is "Iran," all of its activities for itself are services in violation of the IEEPA.  Thus, when Assa takes any act as "Assa," whether it be receiving or transferring money from an account in the U.S., it is providing a service to the Government of Iran.  When it takes any act to maintain the partnership, such as approving any acts as to which the partnership agreement requires approval, it is providing services to Iran.

2.   Alavi's Services to Iran

As stated above, Alavi concedes that it has provided services to Assa: it has acted as the managing partner of their 650 Fifth Ave. Co. partnership and has been paid substantial fees for those services.  (See, e.g., McReynolds Decl. Ex. 37 (Partnership Agreement 18).)  This alone constitutes an IEEPA violation.

But there is a far broader IEEPA violation in which Alavi has engaged.  The Government has also asserted that Alavi conspired with Bank Melli to conceal Assa's true identity and provided services to Assa that concealed its identity.  To establish this IEEPA violation on this motion, the Government must demonstrate the absence of a triable issue of fact that Alavi knowingly entered into an agreement with Bank Melli for the purpose of concealing its identity.  Of course, on the facts above demonstrated, Alavi executed the partnership agreement knowing precisely who Assa was.  Alavi points to the facts in the record relating to Assa's

formation as indicating a desire to resolve certain tax issues — not, at that time, to conceal Bank Melli's ownership.

However, Assa's origin establishes knowledge; that knowledge is not itself the IEEPA violation — it becomes an IEEPA violation when it is combined with acts that then assist in concealing Bank Melli's identity when providing such concealment service is unlawful.  There is no triable issue that, at various times over the years, Alavi knew that Bank Melli continued to control Assa.  In 1992, Alavi is stated to be in a partnership with Bank Melli with respect to the Building.  (McReynolds Decl. Ex. 83 (Aug. 27, 1992 Foundation meeting minutes).)  And, of course, Ebrahimi's notes from a 2007 meeting with Khazaee and Alavi president Jahedi refer to "Assa → Bank Melli 40% share."  (McReynolds Decl. Ex. 41 (Ebrahimi notes).)

Alavi argues that its officers could not have conspired with Assa to conceal its true identity following the imposition of the ITRs in 1995, because Alavi's officers and directors somehow did not know who controlled Assa.  This requires (1) some act showing a true exit by Bank Melli from its ultimate control, or (2) collective amnesia.  There is no triable issue as to either.  Alavi has proffered a series of letters from Alavi's officers or attorney-agents to Assa's that it claims support a triable issue as to what Alavi knew about Assa.  In fact, the letters raise no triable issue.  In the letters, Alavi asks who the "owners" or "stockholders" of Assa are or to set up a meeting.  (See Ruzumna Decl. Exs. Nos. 35 – 43.)  But of course, Bank Melli had been using straw owners and stockholders from the outset of Assa's existence;

none stopped the U.S. Treasury's designation of Assa on the SDN as a front for Bank Melli.

Not a single letter asks whether, in light of the long-established history of Assa acting as a front for Bank Melli, Assa has taken some act to break with Bank Melli or even whether it continues to have a relationship to Bank Melli or Iran. The letters never, in fact, use the word "Iran" at all; they carefully avoid direct, revealing questions. Given Alavi's involvement in creating the 1989 partnership and the many documents in the 1990s regarding Bank Melli's role, no rational juror could find the absence of any mention of Bank Melli or Iran in Alavi's letters to indicate true ignorance.

The letters are as follows:

- An August 30, 1995 letter from Robert Ferguson, counsel to Alavi at Patterson, Belknap, Webb & Tyler, to Peter Livingston, a board member and counsel to Assa, which asks for information with respect to the "Channel Island" corporation [Assa Co. Ltd.].  Ferguson asks, inter alia, "Who are [the Channel Island corporation's] owners?" (Ruzumna Decl. Ex. 35 (Aug. 30, 1995, letter from Ferguson to Livingston).)  This letter does not raise a triable issue, however, because it was written by an individual as to whom there is no evidence on this motion that he possessed any knowledge of Alavi's affairs, books, and records in order to have understood the long history between Alavi, Bank Melli, and Assa.  In addition, his inquiry into the

identity of the owners is irrelevant given that there is no dispute that Bank Melli was acting to conceal its identity and was using front companies such as Assa to do so.

- On November 7, 1995, Geramian requested that a Mr. Shah-at in Dubai tell him who owned Assa Corp.'s stock and who were Assa Ltd.'s owners and stockholders.  (Ruzumna Decl. Ex. 36 (Nov. 7, 1995, letter from Geramian to Shafa-at).)  This letter, however, does not ask (1) whether Bank Melli retained ultimate control over Assa, as had been the case since its formation, or (2) whether the Iranian Government continued to retain control over Assa.  The simple fact that Geramian sought the name of Assa's front owners is not probative of the ultimate owners' identity, when it is clear that Alavi itself assisted Bank Melli in forming Assa and Assa Co. Ltd. in 1989 and thus that intermediaries were nothing new.  Finally, the uncontested record evidence shows that Geramian had himself met with Bank Melli officials in Tehran in the early 1990s to discuss the sale of the very Assa stake here at issue.  (McReynolds Decl. Ex. 83 (Aug. 27, 1992 Foundation meeting minutes).)  Finally, Jahedi, the president of the Foundation, discussed Bank Melli's continued 40% interest in Assa at an October 2007 meeting with Ebrahimi and Khazaee.  (See Government's SOF ¶ 68–69; McReynolds Decl. 86 (October 2007 Jahedi meeting notes).)  It defies credulity — and no reasonable juror could

54

infer from this letter — that Geramian suddenly suffered amnesia with respect to Assa's true identity.

- On November 6, 2003 — eight years after the initial letter from the same firm asking nearly identical questions (with no change in the indirect tone and nature of the inquiry) — a different Alavi Foundation lawyer from Patterson, Belknap, Webb & Tyler, John Winter, again asked Peter Livingston identify the "intermediate and ultimate owners and principals of Assa Corp. as well as their countries of origin." (Ruzumna Decl. Ex. 37 (Nov. 6, 2003 letter from Winter to Livingston).)  Livingston responded on November 11, 2003, "With respect to the identity of the principals of Assa Corp. and Assa Ltd., I am surprised that you are asking for this information since the parties have been engaged in a partnership enterprise for almost 15 years, and I am sure your client knows the names of the individuals . . . .  With respect to your request at this point for additional information regarding their country of national origin, I'm not sure that is appropriate, and I will consult with my client regarding this matter." (Ruzumna Decl. Ex. 43 (Nov. 11, 2003 letter from Livingston to Winter).)  Livingston's response clearly communicated that the information that Alavi had already developed over the course of its 15-year relationship with Assa would provide it all of the information it needed to understand who Assa was.  Therefore, Livingston's letter

refutes the contention that there had been a significant change after 1995 that would have altered that information.

- On January 17, 2006, Geramian wrote to Assa's Tafti requesting a meeting with the members of Assa's board of directors, stating, "Our general counsel has advised that in order to protect our legal interests such a meeting is necessary." (Ruzumna Decl. Ex. 38 (Jan. 17, 2006 letter from Geramian to Tafti).) This letter does not ask Tafti to identify Assa's owners, let alone whether Assa has maintained its relationship with Bank Melli or whether it is controlled by Iran. Geramian invoked his Fifth Amendment privilege against self-incrimination at his deposition when asked about this letter. Tafti refused to obey a court order to be deposed, and the Court imposed Rule 37 sanctions in the form of an adverse inference against him.

- On May 22, 2006, Geramian again wrote to Tafti to request a meeting with Assa's directors, this time copying Ahmadi. (Ruzumna Decl. Ex. 39 (May 22, 2006 letter from Geramian to Tafti).) Ahmadi also invoked his Fifth Amendment privilege against self-incrimination at his deposition in this matter.

- On July 12, 2006, Geramian again wrote to Tafti to request a meeting with Assa's directors. (Ruzumna Decl. Ex. 40 (July 12, 2006 letter from Geramian to Tafti).) Again, Geramian asked no direct questions as to whether Assa was connected to Bank Melli or to Iran.

- On March 28, 2007, Alavi's outside counsel Winter again wrote to Livingston to request a meeting with Assa directors and complained that "Assa's U.S. representative, Dehaghani Tafti, has refused to arrange one." (Ruzumna Decl. Ex. 41 (March 28, 2007 letter from Winter to Livingston).)  In the same letter, Winter noted that Alavi believed this level of due diligence is required, citing "U.S. Department of the Treasury Anti-Terrorist Financing Guidelines: Voluntary Best Practices For U.S.-Based Charities."  Again, nothing in the record indicates that Winter knew of Alavi's long history with Assa. Furthermore, he made no reference to Livingston's prior response, and he referred to what should have been red flags: both Tafti not responding to meeting requests and the "Anti-Terrorist Financing Guidelines."  The only logical inference to be drawn from this letter is that even if Winter was in the dark as to "who" Assa was, there is no indication that his client did not know.  Indeed, Livingston had previously told him that his client did know.  Thus, this letter makes clear that Alavi's agents themselves were at best ignoring red flags.

- In the last letter in this series, dated August 30, 2007, Jahedi wrote to Tafti to request a meeting with the stockholders and/or managers of the parent company.  (Ruzumna Decl. Ex. 42 (Aug. 30, 2007 letter from Jahedi to Tafti).)  Jahedi did not request that Tafti identify the owners or ask whether Bank Melli had ongoing ultimate control.  As events

unfolded, Jahedi knew the history of Alavi's relationship with Assa: as president of Alavi, he had access to its books and records.  Later, after receiving a grand jury subpoena, Jahedi tried to destroy some of these records — for which he was prosecuted.  Jahedi invoked his Fifth Amendment right against self-incrimination at his deposition in this matter.

The series of letters does not, then, create a triable issue as to whether Alavi knew that its dealings with Assa were really dealings with Bank Melli and Iran. Indeed, the 2003 Livingston letter is an example that demonstrate that the only reasonable inference to be drawn from the documentary record is that there had been no significant change in the identity of Assa in 15 years.

Based on the evidentiary record, there is no triable issue of fact as to whether Alavi knew that Assa was a front company for Bank Melli and therefore for Iran.

D.   <u>Proceeds</u>

The Court has determined that there is no triable issue of fact as to at least one violation of the IEEPA as to all Claimants.  Thus, the next question which the Government faces with respect to its claim is precisely "what" is forfeited.  This question may be the same or may be different for Alavi and Assa (though the assets subject to forfeiture by 650 Fifth Ave. Co. would follow according to their percentage ownership).

The statute provides for forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation . . . ." 18 U.S.C. § 981(a)(1)(C).

Section 981 defines "proceeds" as:

> (A)   In cases involving illegal goods, <u>illegal services, unlawful activities</u>, and telemarketing and health care fraud schemes, the term "proceeds" means <u>property of any kind obtained directly or indirectly</u>, as the result of the commission of the offense giving rise to forfeiture, and any <u>property traceable</u> thereto, and is not limited to the net gain or profit realized from the offense.

> (B) In cases involving <u>lawful goods or lawful services</u> that are sold or provided in an illegal manner, the term "proceeds" means <u>the amount of money acquired</u> through the illegal transactions resulting in the forfeiture, less the direct costs incurred in providing the goods or services.

18 U.S.C. § 981(a)(2)(A) – (B) (emphasis added).

The Government correctly argues that Courts apply a "but for" test to determine whether property constitutes proceeds of an offense. <u>See, e.g.</u>, <u>United States v. Grant</u>, No. S4 05 Cr. 1192 (NRB), 2008 WL 4376365, at *2 n.1 (S.D.N.Y. Sept. 25, 2008); <u>see also</u> <u>United States v. Nicolo</u>, 597 F. Supp. 2d 342, 350 (W.D.N.Y. 2009). <u>Cf.</u> <u>United States v. Porcelli</u>, 865 F.2d 1352, 1366 (2d Cir. 1989) (applying RICO forfeiture statute); <u>United States v. Ofchinick</u>, 883 F.2d 1172, 1183 (3d Cir.1989) (same); <u>United States v. Angiulo</u>, 897 F.2d 1169, 1213 (1st Cir. 1990) (same); <u>United States v. Horak</u>, 833 F.2d 1235, 1243 (7th Cir. 1987) (same); <u>United States v. Evanson</u>, No. 05 Cr. 00805 TC, 2008 WL 3107332, at *3 (D. Utah Aug. 4, 2008) ("[P]roceeds are property a defendant would not have obtained or retained but for the commission of the criminal offense.").

1.    <u>Assa's Proceeds</u>

Application of the "proceeds" provision in 18 U.S.C. § 981(a)(2)(A) – (B) requires an initial determination of whether the services provided were illegal or legal, lawful or unlawful activities.  Here, Assa is alleged to have provided the service of acting as a deceptive front for Bank Melli and therefore the Government of Iran.  Accordingly, there can be no doubt that such services fall under the first subsection, for illegal services and unlawful activities.  They directly violate of the IEEPA; no triable issue has been raised as to this fact.

Accordingly, the "proceeds" traceable to Assa's IEEPA offenses are "property of any kind <u>obtained directly or indirectly</u>, as the result of the commission of the offense giving rise to forfeiture, and <u>any property traceable</u> thereto."  18 U.S.C. § 981(a)(2)(A) (emphasis added).

The Court turns first to the question of what property at issue was "obtained" directly or indirectly as a result of the violations.  Again, there is no triable issue of fact: in the absence of Assa acting as a front for Bank Melli, the 650 Fifth Ave. Co.'s assets would long ago have ceased to be owned by Assa.  First, Assa would not have been able to shield the assets from prior forfeiture in response to a number of the civil actions referred to in the statement of facts above.  <u>See supra</u> Part I.E.  In each of those litigations in which Assa is a party, it has fought against the assertion that its properties are subject to forfeiture since they are ultimately owned and controlled by Iran.  That the Building was not originally obtained as a direct result

60

of this concealment does not dictate a contrary result.[32]  Each time Assa prevented forfeiture by acting as a front for Bank Melli, it allowed Bank Melli to "obtain" the value of the property thereby.  See United States v. Torres, 703 F.3d 194, 199 (2d Cir. 2012) ("[T]he forfeiture statute envisions and tolerates some attenuation of the chain of events between the crime and the related property or gain it makes subject to forfeiture.")[33]

As for the bank accounts and other associated properties, it is undisputed that Assa obtained them solely as a result of its ownership interest in and the revenue generated by the Building.  (Government's SOF ¶ 88; McReynolds Decl. Exs. 51, 56 (Alavi Tax Returns, 650 Fifth Ave. Co. Tax Returns)).  Thus, by providing the service to the Iranian Government of shielding the Building from forfeiture, Assa similarly shielded the other subject assets from forfeiture and allowed them to gain in value over time.  For the same reason, Assa's property is therefore traceable to its IEEPA violations.

Assa argues that the Government is not entitled to forfeiture of any funds that existed in Assa's bank accounts more than a year prior to the date upon which

---

[32] Notwithstanding language in this Court's prior decision in the context of a motion to dismiss, see In re 650 Fifth Ave. & Related Properties, 777 F. Supp. 2d 529, 555 (S.D.N.Y. 2011), it is evident on this more fully developed record that the Building and associated properties acquired prior to Assa's IEEPA violations can constitute "proceeds" subject to forfeiture. But for Assa's IEEPA violations, the Building would long ago have been forfeited. Assa's IEEPA violations created ongoing value equal to Assa's interests in the subject properties each time it prevented those properties from being forfeited.
[33] Assa argues that the Government has not explained how a minority interest could be forfeitable as "proceeds."  It is apparent from the discussion above that, because the only way that Bank Melli could have retained its interest in the partnership was through Assa's IEEPA violations, the fact that it is a "minority" interest is irrelevant.  The IEEPA violation depends not on whether Assa is a minority participant, but on the fact that it has acted as a front for Bank Melli, satisfied its partnership obligations, and sent money overseas.

the Government filed its initial Verified Complaint. (Assa's Memorandum of Law in

Opp. to Gov't's Mot. for Summ. J. at 16.)

Section 984(a)(1) and (b) provide:

> (a)(1) In any forfeiture action in rem in which the subject property is
> cash . . . funds deposited in an account in a financial institution . . .
>
> > (A) it shall not be necessary for the Government to identity the
> > specific property involved in the offense that is the basis for the
> > forfeiture; and
> >
> > (B) it shall not be a defense that the property involved in such
> > an offense has been removed and replaced by identical property.
>
> (2) Except as provided in subsection (b), any identical property found in
> the same place or account as the property involved in the offense that
> is the basis for the forfeiture shall be subject to forfeiture under this
> section.
>
> (b) No action pursuant to this section to forfeit property not traceable
> directly to the offense that is the basis for the forfeiture may be
> commence more than 1 year from the date of the offense.

18 U.S.C. § 984(a) – (b).

18 U.S.C. § 984(a) "frees the Government from having to prove that the

dollars in the Account are the same ones that are traceable to the criminal activity

giving rise to the forfeiture." United States v. $1,399,313.74 in U.S. Currency, 591

F. Supp. 2d 365, 371 (S.D.N.Y. 2008).  Furthermore, in 2000, Congress added

Section 984(d), which provides that "[n]othing in this section may be construed to

limit the ability of the Government to forfeit property under any provision of law if

the property involved in the offense giving rise to the forfeiture or property

traceable thereto is available for forfeiture."  This provision made clear that "§ 984

enhances rather than replaces and limits the government's forfeiture powers" and

that "where the government can establish property is traceable to an offense giving

rise to forfeiture, it is free to proceed under any other provision of law, whether or

not the property is fungible."  United States v. Contents in Account No. 059–

644190–69, 253 F. Supp. 2d 789, 794 (D. Vt. 2003).

Notably, the Government has sought forfeiture under both § 981 and § 984.

Thus, the proceeds of any property obtained as a result of an IEEPA violation and

traceable to an IEEPA violation are subject to forfeiture.  As this Court has set forth

above, those requirements have been met as to all of Assa's assets — including the

bank account — because the sole source for such funds was the IEEPA violations.

In addition, however, Assa misreads the statute.  This statute in fact

provides for precisely the forfeiture of bank accounts the Government seeks here.

The Government commenced its action in December 2008; as of that date, and on

that date by definition, Assa was engaged in individual and separate actions to

conceal the fact that it was a front for Bank Melli.  Every act it took on the day the

complaint was filed, the day before, and the day before that was an act of providing

the service to Bank Melli and Iran of concealing their control and ultimate

ownership.  There is no issue with respect to a one-year — or five-year — timeframe

with respect to Assa's violations and the assets subject to forfeiture resulting

therefrom.[34]

---

[34] The five-year statute of limitations for civil forfeiture actions is dealt with in more detail infra in
Part VII.

2. <u>Alavi's Proceeds</u>

The Court turns next to what proceeds are subject to forfeiture as a result of Alavi's violations of the IEEPA.[35]

 The initial question is whether Alavi's first IEEPA violation — which involved simply managing the partnership on behalf of an entity ultimately owned and controlled by Iran (whether it knew it or not) — constitutes the provision of lawful or unlawful services, or lawful or unlawful activities.

The "lawful" services or activities that Alavi engaged in for Iran were its pure building services.  Its actions as the general manager of the partnership and therefore as the primary manager of the building are certainly lawful in the strict sense.  The proceeds obtained as a result of this offense would encompass the category of all management fees received.

However, as stated above, there is also no triable issue as to a much broader IEEPA violation: acting as the general partner of a partnership while knowing that the minority partner was controlled by Bank Melli and thus the Government of Iran.  The service of acting as the general partner enabled Bank Melli to obtain the array of services needed to manage its partnership interest and to conceal its identity, thus enabling Iran to receive partnership distributions and the value of the partnership assets.  If it had been known earlier that Alavi was providing such services, its interest would have been forfeited.  Thus, Alavi retained its partnership interest through its concealment service.  Alavi's entire partnership interest is

---

[35] The Government has asserted other IEEPA violations, but the Court has found triable issues of fact as to those violations.

therefore traceable to illegal services; those illegal services also separately allowed the partnership assets to be retained.  <u>United States v. Evanson</u>, No. 05 Cr. 00805 TC, 2008 WL 3107332, at *3 (D. Utah Aug. 4, 2008) ("[P]roceeds are property a defendant would not have obtained or retained but for the commission of the criminal offense.").

VI.   <u>MONEY LAUNDERING</u>

The Government has also moved for summary judgment as to its second basis for forfeiture: the anti-money laundering under 18 U.S.C. § 981(a)(1)(A).  That statute provides in relevant part:

> (a)(1) The following property is subject to forfeiture to the United States:
>
>> (A) Any property, real or personal, <u>involved in</u> a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property <u>traceable to</u> such property.[36]

18 U.S.C. § 981(a)(1)(A) (emphasis added).

Section 981(a)(1)(A) provides, therefore, for broader forfeiture than 18 U.S.C. 981(a)(1)(C), the IEEPA forfeiture provision.  If entitlement to forfeiture is shown under this section, then "any property" "involved in" or "traceable to" the violation is subject to forfeiture.  Here, too, a claimant may assert an "innocent owner defense" should the Government establish the properties' forfeitability.

Section 981 incorporates three anti-money laundering criminal statutes: 18 U.S.C. §§ 1956, 1957, and 1960.  Here, the Government has alleged and moved for

---

[36] In order to demonstrate entitlement to forfeiture under this section, "the Government shall establish that there was a substantial connection between the property and the offense." 18 U.S.C. § 983(c).  There is no triable issue as to this element, since concealing the identity of the ultimate true owner of the partnership assets was the point of the activities.

summary judgment on the basis that Claimants have violated 18 U.S.C. § 1956.

The Government asserts that Claimants have violated Section 1956 in three ways:

by "promotion" money laundering, "concealment" money laundering, and

"international" money laundering.

Section 1956 provides:

> (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—
>
>> (A)(i) with the intent to promote the carrying on of specified unlawful activity; or . . . .
>>
>> (B) knowing that the transaction is designed in whole or in part—
>>
>>> (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; [shall be guilty of an offense]. . . . [37]
>
> (2) Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—
>
>> (A) with the intent to promote the carrying on of specified unlawful activity; or
>>
>> (B) knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that

---

[37] Under the statute, "the term 'financial transaction' means a transaction which in any way or degree affects interstate or foreign commerce (i) involving the movement of funds by wire or other means or (ii) involving one or more monetary instruments, or (iii) involving the transfer of title to any real property, vehicle, vessel, or aircraft, or a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree." 18 U.S.C. § 1956(c)(4).

such transportation, transmission, or transfer is designed in whole or in part—

> (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

> (ii) to avoid a transaction reporting requirement under State or Federal law,

shall be [guilty of an offense].

18 U.S.C. § 1956(a). Attempt and conspiracy to commit the offenses listed above are also criminalized by the statute. 18 U.S.C. § 1956(a)(1),(2); 18 U.S.C. § 1956(h).

### A.   Meaning of "Involved In"

The phrase "involved in" as used in the money laundering statute refers both to property that is itself being laundered, as well as property used to facilitate a money laundering offense. United States v. Approximately 250 Documents Containing the Forged Hand Writing of President John F. Kennedy and Others, No. 03 Civ. 8004 (GBD), 2008 WL 4129814, at *3 (S.D.N.Y. Sept. 5, 2008); see also 134 Cong. Rec. S17365 (daily ed. Nov. 10, 1988) ("[T]he term 'property involved' is intended to include the money or other property being laundered (the corpus), any commissions or fees paid to the launderer, and any property used to facilitate the laundering offense."). Thus, there are three types of property that may be "involved in" laundering offenses: (1) the property that is the subject of a money laundering transaction itself, (2) the property used to facilitate the money laundering offense (rather than any underlying offense), and (3) the fees or commissions paid to the launderer.

The forfeiture statute imposes an additional constraint on property that is considered "involved in" a money laundering offense: there must also exist a "substantial connection" between the property to be forfeited and the money laundering offense.  18 U.S.C. § 983(c)(3); 146 Cong Rec. H2040, 2050 (daily ed. Apr. 11, 2000) (statement of Rep. Hyde) (explaining that the a connection must be "significantly greater than just incidental or fortuitous") (internal quotation marks omitted).

The Second Circuit has affirmed the notion that an entire business premises is "substantially connected" to the money laundering offense where it has "'served as a conduit for the proceeds of the illegal transactions.'"  United States v. Schlesinger, 261 Fed. App'x 355, 361 (2d Cir. 2008) (quoting United States v. All Assets of G.P.S. Auto. Corp., 66 F.3d 483, 486 (2d Cir. 1995)).[38]

Here, Alavi's services in violation of the IEEPA enabled the Partnership to earn rent from the Building.  Meanwhile, the alleged money laundering occurred when the partnership, Alavi, and Assa Corp. distributed the rent with the intent to conceal that it was meant for the benefit of the Iranian government and caused partnership funds to be transferred abroad.  On the record before the Court, there is no triable issue of fact as to any of the Government's money laundering theories —

---

[38]  The business at issue in Schlesinger was a clothing manufacturing enterprise owned by two brothers who were convicted of mail and wire fraud.  United States v. Schlesinger, 396 F. Supp. 2d 267, 270 (E.D.N.Y. 2005), aff'd, 514 F.3d 277 (2d Cir. 2008).  The Second Circuit found that, although the proceeds of the fraud did not constitute the entirety of the business, the business premises were nevertheless forfeitable as a "conduit" for the proceeds.  Schlesinger, 261 F. App'x at 361.  The court found the requisite "substantial connection" between the proceeds and the premises because "[e]vidence at trial showed that Schlesinger deposited the proceeds of his insurance and creditor fraud into the business operating accounts of the companies he ran at the premises, and the proceeds were then used to pay the companies' monthly lease and tax expenses."  Id.

promotion, concealment, or international.  Having engaged in a money laundering

violation, the entirety of the 650 Fifth Avenue Building (the business premises) and

all of the associated bank accounts are subject to forfeiture — even if they were not

used in the money laundering offense itself.

> B.   Promotion Money Laundering

To prevail on its motion that Claimants have engaged in "promotion money

laundering," the Government must demonstrate the absence of a triable issue of

fact as to whether Claimants knew that property involved in a financial transaction

represented the proceeds of unlawful activity and that they conducted or attempted

to conduct a financial transaction involving those proceeds "with the intent to

promote" the carrying on of that that unlawful activity.  United States v. Gotti, 459

F.3d 296, 334 (2006) (citing 18 U.S.C. § 1956).

Numerous courts have held that using unlawful proceeds to pay for expenses

can constitute promotion money laundering.  See, e.g., United States v. Lee, 558

F.3d 638, 642 (7th Cir. 2009) (stating that rent payments "clearly satisfy the

requirement that the transactions were made with the intent to promote the

carrying on of the underlying illegal operation"); United States v. Lawrence, 405

F.3d 888, 901 (10th Cir. 2005) (holding that evidence that the defendant used

proceeds to pay rent was "sufficient to show an intent to carry on the fraud for the

purposes of the money laundering charges"); United States v. Murray, 154 F. App'x

740, 744 (11th Cir. 2005) (holding that proceeds "spent on rent, furniture, payroll,

travel expenses, and office supplies [were] integral to creating an impression of

69

legitimacy that would entice their victims to pay" and were "spent with the intent to promote the fraudulent scheme"); United States v. Pressley, 20 Fed. App'x 331, 334 (6th Cir. 2001) (upholding money laundering convictions where "the defendants knowingly deposited proceeds from the investors into bank accounts and expended those proceeds on . . . an office from which their efforts to promote their fraudulent scheme were conducted").

Entities engaged in money laundering to promote underlying criminal activity can be forfeited.  See, e.g., United States v. Eleven Vehicles, et al., 836 F. Supp. 1147, 1155 (E.D. Pa. 1993); United States v. Joseph Health & Beauty Supply, 807 F. Supp. 320, 321 – 22 (S.D.N.Y. 1992).

### 1.   Promotion Money Laundering as to Assa

Based on the facts set forth above, this Court has already determined the absence of a triable issue as to whether Assa was acting as a front to conceal Bank Melli's true ownership and control — it was.  Accordingly, each time Assa sent proceeds from its partnership distributions overseas to Assa Co. Ltd., Assa engaged in money laundering.  In accepting those proceeds overseas as part of the scheme to conceal Bank Melli's true identity, Assa again engaged in promotion money laundering.

In addition, however, it is undisputed that approximately $75,911,609 in proceeds from the ownership of the Building was used to improve the Building. (Government's SOF ¶ 88; McReynolds Decl. Exs. 51, 56 (Alavi Tax Returns, 650 Fifth Ave. Co. Tax Returns).)  This resulted in taking the proceeds of unlawful

activity and cleansing it by putting it into the Building, thereby maintaining or increasing the value of the Building.  That separately constitutes promotion money laundering by Assa.

2.   <u>Promotion Money Laundering as to Alavi</u>

In the context of its analysis of the "innocent owner defense," the Court has already determined that there is no triable issue as to whether Alavi knew that it was dealing with Assa in its capacity as managing partner of the Building; it did. In order to determine whether the Government has carried its burden as to promotion money laundering with respect to Alavi, a similar question exists regarding what Alavi knew about Assa, its partner in the 650 Fifth Ave. Co. The evidentiary record is entirely one-sided on this point: Alavi knew that it was interacting with Bank Melli through Assa, and therefore Iran through Assa.  The facts which Alavi has proffered to dispute this point — namely, the series of letters recited above — are insufficient to raise a triable issue here.  <u>See supra</u> Part V.B.2.

Accordingly, when Alavi was engaging in any number of financial transactions to manage the Building, when it sent Assa its partnership distributions, and when it utilized funds from the Building to purchase other properties or improve or maintain the Building, it engaged in promotion money laundering.  (Government's SOF ¶ 88; McReynolds Decl. Exs. 51 (Alavi Tax Returns), 56 (650 Fifth Ave. Co. Tax Returns).).

C.    Concealment Money Laundering

"Concealment money laundering" prohibits just that: engaging in conduct to make funds look legitimate when in fact they have been derived from specified unlawful activity.  See Gotti, 459 F.3d at 337 (defining "concealment money laundering" as "a transaction . . . that was designed at least in part to conceal the source of . . . moneys").

 "Some direct financial link between a defendant's money laundering and his real property must be shown before a court will order forfeiture of the property." Nicolo, 597 F. Supp. 2d at 356; see also 250 Documents Containing the Forged Hand Writing of President John F. Kennedy, 2008 WL 4129814, at *3 ("Cusack obtained the proceeds of his criminal acts by fraudulently creating and selling the documents to unwary third-party purchasers.").

Furthermore, "[r]eal property is involved in a money laundering offense if laundered funds are used . . . to pay for improvements."  United States v. 10.10 Acres Located on Squires Rd. in Cheeks Township, Orange Cnty., N.C., 386 F. Supp. 2d 613, 616 (M.D.N.C. 2005); see also Schlesinger, 261 F. App'x at 361; United States v. Myers, 21 F.3d 826, 831 (8th Cir. 1994) (property was forfeitable because the defendant "made substantial payments on the real estate contract and improvements on the property from" an "account to which the laundered money had been transferred"); United States v. Real Property and Premises Located at 216 Kenmore Ave., Deerfield, Ill., 657 F. Supp. 2d 1060, 1069 (D. Minn. 2009) ("There is no serious dispute that, by spending allegedly tainted funds on renovations and

property taxes for 950 Bristol Drive, the property is traceable to a money laundering offense.") (internal quotation marks omitted).

There is no triable issue as to whether the Building is forfeitable on this basis.  In support of its motion to dismiss in 2011, Alavi argued that "even if rent were to be considered proceeds of the alleged IEEPA offenses . . . where the alleged involvement is limited to the receipt of criminal proceeds, forfeiture should be proportional to the amount of total funds received."  See In re 650 Fifth Ave. & Related Properties, 777 F. Supp. 2d 529, 566 (S.D.N.Y. 2011) (quoting Alavi's briefs).  But that is not what the statute says.  Section 981(a)(1)(A) does not provide for forfeiture of the proceeds laundered; it provides for forfeiture of "[a]ny property, real or personal, involved in" money laundering or "any property traceable to such property."

However, the Court need not resolve the extent to which the Building was "involved in" money laundering for purposes of the instant motion.  As an entity designed to disguise where money was going, the partnership was no different than a "front" business set up to disguise the origins and destinations of the proceeds of the IEEPA offenses.  And "[t]he ability to forfeit a business entity which is used to facilitate the offense of money laundering is well established."  United States v. Swank Corp., 797 F. Supp. 497, 502 (E.D. Va. 1992).  Indeed, courts have repeatedly held that such "front" entities can be forfeited as "involved in" concealment money laundering.  See, e.g., Schlesinger, 261 Fed. App'x at 361; see also United States v. Seher, 562 F.3d 1344, 1369 (11th Cir. 2009) (forfeiting assets of two jewelry

businesses because "the availability of the two stores' inventories made it easier for [defendant] to launder money" and because the defendant used "company property to create a facade of legitimacy, which aided in the concealment of his actions"); In re Restraint of Bowman Gaskins Fin. Group, 345 F. Supp. 2d 613, 624 (E.D. Va. 2004) (finding that a company's assets "facilitated money laundering activity by enabling and providing an appearance of legitimacy to the money laundering financial transactions"); United States v. S. Side Finance, 755 F. Supp. 791, 797 – 98 (N.D. Ill. 1991) (denying motion to dismiss because "[t]he government contend[ed] that the proceeds from the drug deals were laundered through the car dealership in an attempt to legitimize the profits").

###### D.   International Money Laundering

The Government's final theory under Section 1956 is "international" money laundering pursuant to 18 U.S.C. § 1956(a)(2), also known as "reverse" money laundering.  The international money laundering statute has three elements: (1) that the laundering party transferred (or attempted to transfer) a monetary instrument or funds; (2) that the transfer originated in a place in the United States to or through a place outside the United States; and (3) the transferring party evinced an intent to promote the carrying on of specified unlawful activity, here a violation of IEEPA, or knew that the funds being transferred were proceeds of such activity (and the transfer was meant to conceal that fact).  18 U.S.C. § 1956(a)(2); United States v. Ness, 565 F.3d 73, 77 (2d Cir. 2009).

74

The § 1956(a)(2) theory features three differences from the promotion and concealment money laundering theories outlined above.  First, as its name suggests, the funds must be transferred internationally, i.e., "from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States."  18 U.S.C. § 1956(a)(2).  Second, the funds transferred need not meet the statutory definition of "financial transaction" outlined above; it is sufficient that they be "monetary instruments" — coin or currency of any country, checks, securities, etc. — or "funds."  Id.; 18 U.S.C. § 1956(c)(5)(defining monetary instrument).  The third and major distinction is that § 1956(a)(2) "does not require the funds in question to be proceeds of prior unlawful activity."  United States v. $739,047.03 in U.S. Currency, 103 F. App'x 245, 247 (9th Cir. 2004).  Rather, if the transfer of funds outside of the United States is accomplished with the "intent to promote the carrying on" of IEEPA violations, then any property "involved in" that transfer is subject to forfeiture.  Id.  Conspiracy and aiding and abetting theories apply to § 1956(a)(2) money laundering as well.  18 U.S.C. § 1956(a)(2)(criminalizing an "attempt[ ] to transport, transmit, or transfer a monetary instrument or funds"); 18 U.S.C. § 1952(a)(criminalizing a conspiracy to commit any of the § 1956 money laundering offenses).

None of the Claimants raises a triable issue as to international money laundering.  As to Assa, it is undisputed that the 650 Fifth Ave. Co. partnership periodically transferred funds to Assa Corp. within the United States and that Assa Corp., in turn, transferred the funds from its United States bank accounts to its

parent company, Assa Ltd., in the United Kingdom.  Each of the steps required to engage in the international money laundering (receiving and holding funds in a U.S. account; sending those funds overseas) constitutes a separate money laundering transaction.  See United States v. Harris, 79 F.3d 223, 231 (2d Cir.), cert. denied, 519 U.S. 851 (1996).

The Government presents uncontested evidence that Assa Corp. made such a transfer as late as March 2004, well within any applicable limitations period.  (See Government's SOF ¶¶ 56 – 57; McReynolds Decl. Exs. 94 – 96 (Assa checks).)   As explained above, the Court finds no triable issue that Assa is merely a front for Bank Melli; therefore, Assa's purpose in every transfer from Assa Corp. to Assa Ltd. was to conceal the ultimate owner of those funds — Bank Melli — with the knowledge that the purpose of that transfer was to conceal the true ownership of the funds and to avoid OFAC reporting requirements.  In addition, the funds themselves were proceeds of IEEPA violations in that they violated the ITRs banning exports of funds to Iran.

Alavi Foundation and the 650 Fifth Ave. Co. also fail to raise a triable issue as to § 1956(a)(2) international money laundering.  Alavi argues that, even if Assa's interest is forfeitable, that Alavi did not itself make any international transfers and thus cannot forfeit its interest in any of the Defendant Properties under § 1956(a)(2).

The Court disagrees.  The Second Circuit has held that a multi-step plan — such as that here — to transfer money from the United States to a location outside

the United States should be viewed as a single "transfer" under § 1956(a)(2), even where the first step of the transfer is a wholly domestic transaction.  Harris, 79 F.3d at 231; see also United States v. Dinero Exp., Inc., 313 F.3d 803, 806 (2d Cir. 2002) (quoting Harris, 79 F.3d at 231).  Thus, it is irrelevant that Alavi — as manager of the partnership — only transferred funds to Assa Corp. within the United States.  Rather, as analyzed above, Alavi raises no triable issue as to its status as a co-conspirator with Assa / Bank Melli; it was engaged in such a conspiracy.  Therefore, Alavi knew that it's transfer of assets from the 650 Fifth Ave. Co. to Assa Corp. was for the purpose of making an international transfer to Assa Co. Ltd. that would further the violations of IEEPA outlined above.  That Assa Corp., rather than Alavi, was the corporate entity that exported the funds is of no moment.  Alavi does not dispute that it knew such transfers took place, and no triable issue exists as to its participation in a conspiracy to violate the IEEPA by making such transfers.  (See Government's SOF ¶ 57; McReynolds Decl. Exs. 96, 97 (checks from Assa Corp. to Assa Ltd. dated August 18, 2004 and March 9, 2004).)

Having failed to raise a triable issue under § 1956(a)(2), the entirety of the Alavi and Assa interests in the Building are forfeitable on international money laundering grounds.  As analyzed above, the rents that were transferred abroad were generated by the partnership's management of the Building; without the Building, no rents would have accrued or been transferred abroad to Assa Co. Ltd. There can be no doubt that the Building is property "involved in" the international money laundering violation.  Similarly, the bank accounts of the partnership and of

Assa Corp. through which those funds were laundered are also property "involved in" the money laundering.  Both the Building and the accounts bear a substantial connection to the IEEPA violations — they are part and parcel of the concealment of the true ownership of Assa and provide the means by which Alavi can provide management and concealment services to Iran — and are thus subject to forfeiture.

VII.   <u>STATUTE OF LIMITATIONS</u>

The statute of limitations is an affirmative defense to the forfeitability of the <u>in rem</u> properties.  At trial, Claimants would bear the burden of proving by a preponderance of the evidence that the limitations period expired before the Verified Amended Complaint was filed on December 17, 2008, as to Assa, and November 16, 2009, as to Alavi.  On summary judgment, Claimants bear the burden of demonstrating no triable issue as to this defense.  <u>See</u> <u>Johnson</u>, 263 F.3d at 1264; <u>Frankel</u>, 930 F. Supp. at 64; <u>Dollar Dry Dock Savings Bank</u>, 1995 WL 412572, at *5; <u>Harper</u>, 743 F. Supp. at 1090 – 91; <u>Sec. Pac. Mortg. & Real Estate Servs., Inc.</u>, 690 F. Supp. at 1219.  No Claimant has raised this issue on this motion.[39]  The Court has itself scoured the record to determine if there is a triable issue as to this defense.  There is not.

The statute of limitations for a civil forfeiture action is the later of (1) five years from the date when the entity bringing suit "knew or should have known" of the conduct giving rise to the claim or (2) within two years after the time when the involvement of the property in the alleged offense was discovered.  19 U.S.C. § 1621.

---

[39] Assa raises a one-year statute of limitations argument with respect to bank accounts, dealt with <u>supra</u>.  Separately, Alavi has made it abundantly clear that it would intend to raise the five-year statute of limitations at trial.

To be clear, the issue is not when the conduct may have commenced.  See United States v. Twenty-Seven Parcels of Real Prop. Located in Sikeston, Scott Cnty., Missouri, 236 F.3d 438, 441 (8th Cir. 2001) (explaining the statute of limitations under the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA")).  Rather, it is based on when the party initiating suit — here, the Government — could or should have reasonably understood that it had a claim.  Id.  The Government may, in fact, have had many claims that would have led to forfeiture.  That is also not the issue.  The issue is whether its claims here at issue were timely.

Is there a triable issue as to whether more than five years elapsed between the time that the Government "knew or should have known" of the conduct giving rise to the alleged IEEPA or money laundering violations and the filing of the initial complaint or VAC?

While the Second Circuit is yet to squarely address this issue, both the Seventh and Fourth Circuits have found that where, as here, the violations alleged involve a course of conduct with multiple underlying offenses, the Government is deemed to "discover" each new offense as it occurs.  See United States v. 5443 Suffield Terrace, Skokie Ill., 607 F.3d 504, 508 (7th Cir. 2010) ("When there are multiple, distinct underlying crimes that independently could support forfeiture of the same property, nothing in the plain language of § 1621 bars a court from adjudicating a forfeiture action as long as at least one alleged offense is not time-barred, even if the statute of limitations has run on the remainder of the underlying crimes."); United States v. Kivanc, 714 F.3d 782, 790 (4th Cir. 2013) ("[A] court

may adjudicate a forfeiture action as long as one underlying offense is not time-barred, even if the statute of limitations has run on the remaining offenses.").

It is thus irrelevant whether the Government possessed enough information prior to November 16, 2004 (five years prior to the filing of the Amended Verified Complaint) to bring its forfeiture action against Alavi (or, before December 17, 2003, against Assa).  Rather, the key question is whether the Government first learned of (or should have learned of) any <u>individual</u> IEEPA, ITR, and money laundering violations after November 16, 2004 (with respect to Alavi) and after December 17, 2003 (with respect to Assa).

The uncontested facts demonstrate that many such violations have occurred within the limitations period.  Most important, Alavi managed the Building on behalf of Assa continuously through the filing of the Verified Amended Complaint; each day it did so constituted a separate IEEPA violation.  In addition, each distribution payment made by Alavi as manager of the 650 Fifth Avenue Co. to Assa constituted an IEEPA violation and also, as analyzed above, was a money laundering transaction.  (<u>See</u> Government's SOF ¶ 56; McReynolds Decl. Ex. 51 (tax returns of Alavi Foundation).)  Such payments occurred quarterly until December 1, 2008 — days before the forfeiture action was filed and a protective order directed Alavi and Assa to submit the partnership distribution payments to the custody of the U.S. Marshal.  The international transfers from Assa Corp. to Assa Ltd. constituted additional violations in which Assa was a principal and Alavi a co-conspirator.  (<u>See</u> McReynolds Decl. Exs. 96, 97 (checks from Assa Corp. to Assa

Ltd. dated August 18, 2004 and March 9, 2004).)  These transactions, all within the limitations period, defeat any limitations defense with respect to those transactions.[40]

This finding is consistent with the purposes of the forfeiture statute of limitations.  The limitations period exists to prevent a party that has been the subject of criminal prosecution to have to worry for decades after as to whether the Government will seek to forfeit its property.  It provides some certainty against the extraordinary, quasi-criminal remedy of forfeiture.  However, it could not have been Congress's purpose to prevent the Government from seeking forfeiture in a case such as this.  Otherwise, a party continuously providing services to Iran in violation of IEEPA and other statutes could permanently escape forfeiture (and continue its violations unfettered) where the Government fails to bring suit within five years of its first discovery one violation.  This outcome defies logic.  As such, no triable issue exists as to the limitations defense.

----

[40] This holding renders moot the Alavi Foundation's letter motion (ECF No. 811) for spoliation of evidence by the IRS.  Spoliation sanctions such as an adverse inference are appropriate where the party seeking such relief demonstrates that (1) the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) the records were destroyed "with a culpable state of mind"; and (3) the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense. Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 107 (2d Cir. 2002).  Alavi argued that IRS records relating to Alavi from the 1990s had been destroyed by the IRS.  It stated that material would be relevant to its defenses that (1) the IRS investigated Alavi and found no evidence of criminal wrongdoing and (2) that the limitations period had run because the Government was on notice of the conduct alleged in the Verified Amended Complaint much earlier than 2004.  As the Court has stated previously, Alavi has failed to demonstrate the relevance of the first issue to its case – the Court's decision on summary judgment in no way requires or relies upon a criminal finding against Alavi.  The lack of criminal prosecution would in no way demonstrate that the defendant properties are not subject to forfeitability; not every IEEPA violation is prosecuted criminally. In addition, the analysis here demonstrates numerous IEEPA violations clearly within the limitations period.  The evidence destroyed by the IRS — even assuming that Alavi could meet its burden to show that the destruction was intentional — is thus irrelevant to Alavi's defenses.  The spoliation motion is denied.

VIII.  CONCLUSION

As set forth above, all of the assets at issue in this litigation, with the exception of the seven Alavi-only properties described supra, are subject to forfeiture.

Issues relating to the seven Alavi-only properties and the innocent owner defense of the judgment creditors are severed for further proceedings.

SO ORDERED.

Dated:      New York, New York
            September 16, 2013

                                        KATHERINE B. FORREST
                                        United States District Judge

82