UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: February 28, 2017
```

------------------------------------------------------------X
:
:
:
IN RE: 650 FIFTH AVENUE AND                  :
RELATED PROPERTIES                           :
:
:
:
------------------------------------------------------------X

08 Civ. 10934 (KBF)
and all member and
related cases

<u>OPINION & ORDER</u>

KATHERINE B. FORREST, District Judge:

     This is a civil forfeiture action initially filed in 2008. Plaintiffs – a group of individual victims of terrorism in which Iran participated (or their estates), along with the United States – seek forfeiture of properties and assets owned by Assa Company Ltd. and Assa Corporation (together, "Assa"),[1] the Alavi Foundation ("Alavi"), and their partnership the 650 Fifth Avenue Company ("650 Fifth Ave.") (together with Alavi, "Claimants" or "defendants"). Discovery in this case closed in stages; the last stage ended on June 28, 2013.

     Trial was previously set to commence on September 9, 2013. On the eve of trial, the Court indicated that it intended to grant summary judgment to plaintiffs and adjourned the trial. The Court issued its Opinion & Order on September 16, 2013. (ECF No. 865.) The crux of that decision was twofold: First, the Court determined that Assa was (and is) a front for the Government of Iran and violated the International Emergency Economic Powers Act ("IEEPA"), certain Iranian

---

[1] On September 16, 2013, the Court granted summary judgment with regard to claims against Assa (ECF No. 865); Assa did not appeal that decision.

Transaction Regulations ("ITRs") issued by the United States Treasury banning the provision or export of services to Iran, and federal money laundering statutes. Second, the Court determined that defendants also violated the IEEPA and the ITRs, because it was conceded that defendants provided services to Assa.

The Second Circuit affirmed this Court's decision that Assa was in fact a front for Iran, but reversed and remanded with regard to certain other issues concerning the defendants.  See In re 650 Fifth Ave. & Related Properties, 830 F.3d 66 (2d Cir. 2016).  The Second Circuit held, inter alia, that this Court erred in rejecting defendants' possible statute of limitations defense without providing defendants an opportunity to be heard on that defense.  Id. at 96-97.

Having received the mandate from the Second Circuit, this Court has resumed proceedings and has scheduled trial necessary for final resolution of this matter.  In connection with these proceedings, defendants now seek to reopen discovery.  Specifically, defendants claim that discovery is necessary to support their statute of limitations defense; defendants allege that "[d]uring the pre-appeal litigation phase of this forfeiture action, [they] sought, but were repeatedly denied, discovery critical to their statute of limitations defense, i.e., discovery that would show when the Government first learned of the alleged acts giving rise to forfeiture."  (ECF No. 1439 at 2.)  In support of their application, defendants cite footnote 28 of the Second Circuit's decision, where the court stated: "The District Court had repeatedly denied Claimants' attempts to obtain discovery that might

show when the Government learned of the Claimants' alleged forfeitable offenses." In re 650 Fifth Ave, 830 F.3d at 97 n.28.

For the reasons discussed below, the Court DENIES defendants request to reopen discovery.  Defendants are entitled to be heard on their statute of limitations defense, as the Second Circuit held.  Defendants are not entitled to new discovery, however, in order to present their defense.  Critically, defendants misrepresent the pre-appeal record and status of discovery that preceded the Second Circuit's opinion.  Likewise, it appears that the Second Circuit was not provided with a complete overview of the discovery history in this case.

This Court and the parties spent vast amounts of time and energy on discovery issues over a period from 2012 until June 28, 2013.  There were multiple hearings and many motions.  In deciding to deny defendants instant request, the Court has conducted a comprehensive review of the previous discovery in this case, much of which is detailed in the body of this opinion.  As discussed, the discovery that defendants now seek regarding the statute of limitations is discovery that defendants did not timely seek before.  By not pursuing this discovery before, the Court finds that defendants have waived their entitlement to it.  In short, the Court is unwilling to reopen discovery at this late stage.

I.     DISCUSSION

A.     The Recent Requests

Defendants now seek discovery related to their statute of limitations defense. The specific discovery requests at issue (the "Recent Requests") are appended as Exhibit E to defendant's January 13, 2017, letter application (ECF No. 1439-5).

3

The Recent Requests consume three single spaced pages and seek a sweeping array of documents, including:

- "Records, reports, memoranda, correspondence, notes, and other documents . . ." contained in twelve specifically enumerated FBI files and their related or cross-references files (id. ¶ 1(a) – (l));

- "Records, reports, memoranda, correspondence, notes, and other documents . . ." contained in three additional groups of Government investigation files – defining the Government to include the Department of Justice ("DOJ"), the Department of Treasury ("DOT"), joint federal-state task forces or investigative entities and all successors or predecessors – based on references in certain documents (id. ¶ 1(m)(i)-(iii));

- Documents from and between the Government and New York State or other state authorities, including the New York Attorney General, the New York City Police Department, and the District Attorney's Office for New York County (id. ¶ 2(a)-(c)); and

- Documents relating to communications between "Government agents or employees and the journalists who authored" nine specifically enumerated articles, as well as all documents identifying or relating to investigative steps taken or other efforts taken in response to such articles or the allegations raised in them (id. ¶ 3(a)-(g)).

The Government has objected to producing these materials as outside the scope of defendants' original discovery requests, as overbroad and unduly burdensome, and because certain documents are protected from disclosure by applicable privileges.  (See ECF No 1439-6.)

When the Court received defendants' discovery application, it struck the Court that defendants appeared to seek a variety of documents far beyond those ever raised in motion practice during the discovery period.  Accordingly, by Order dated January 18, 2017, the Court ordered defendants (with regard to their statute of limitations defense) to provide "the Court with a chronology and description of

discovery previously sought (including reference to specific requests); identify any previous motions to compel made by Claimants; summarize the arguments made in any such motions to compel; and point to where in the record the Court made ruing with regards to any such previous requests or motions to compel." (ECF No. 1440). Defendants complied with the Court's order by submission dated January 25, 2017. (ECF No. 1445.)

Defendants' January 25 submission demonstrates that defendants had not, in fact, made any of the Recent Requests during the discovery period; and defendants certainly did not bring a motion to compel with regard to any of the materials sought in the Recent Requests during the discovery period.

B.   <u>Defendants' First Requests</u>

Defendants argue that their prior requests were sufficiently broad to encompass the Recent Requests. Specifically, defendants claim that "[d]ocuments relevant to [their] statute of limitations defense fell squarely within those requests" served on May 26, 2011 ("defendants' First Requests"). (ECF No. 1445 at 5.) In support, defendants primarily rely on request number one in defendants' First Requests. (<u>Id.</u>; <u>see</u> ECF No. 1145-2.) This request, which defendants admit functioned as a "catchall" request, sought: "All documents cited, quoted, or referenced in the Complaint, or which in any way relate to the allegations in the Complaint." (ECF No. 1145-2 at 7; <u>see</u> ECF no. 1445 at 5.)

It is plain that, on its face, this catchall request was directed at the affirmative allegations brought against defendants; it does not mention defendants' statute of limitations defense nor does it mention any of the documents sought in

the Recent Requests (let alone all of them).  The only way the Court could construe this request as capturing the documents sought in the Recent Requests is if the Court were to accept that such a broad "catchall" requested all documents on any topic in any way relating to this action.  For the Court to read this request in such a manner would be both unfair and unreasonable; the Court declines to do so.

Defendants next argue that requests numbers four and six in defendants' First Requests "called for more specific categories of documents likely to yield admissible evidence supporting the statute of limitations defense."  (ECF No. 1445 at 6.)  Defendants similarly argue that requests sixteen and seventeen encompass documents clearly responsive to the Recent Requests.  (ECF No. 1445 at 6-7.)

Request number four sought:

> All documents relating to any agreement, practice, promise, joint effort, or understanding, formal or informal, between Claimants and Iran, including but not limited to any agreement whereby [] Claimants would obtain or maintain ownership interests on behalf of Iran, or undertake any efforts on behalf of Iran, contribute capital on behalf of or at the direction of Iran, provide services on behalf of Iran, or take direction from Iran.

(ECF No. 1445-2 at 7.)  Request number six sought:

> All documents relating to any alleged services performed, requested to be performed, or considered by Claimants on behalf of Iran, including but not limited to the alleged services described in paragraph 21 of the Complaint.

(Id. at 8.)  Request number sixteen sought:

> All documents relating to the ownership, control, or management of Assa, including but not limited to documents relating to requests, acts, or efforts to determine the ownership and/or management of Assa, and Assa's responses to such efforts.

(<u>Id.</u> at 9.)  Request number seventeen sought:

> All documents relating to Claimants' purported knowledge, or lack of knowledge, that Assa was owned, controlled, or in any way affiliated with Bank Melli or that Assa consisted of merely two "shell companies."

(<u>Id.</u>)

These requests are, again, plainly directed at the affirmative allegations in the Complaint.  Defendants assert that "[d]ocuments responsive to [requests sixteen and seventeen] would include materials from the FBI, the IRS, the OFAC, and other federal agencies relating to Assa from 1989—when Assa was incorporated—to the present."  (ECF No. 1445 at 7.)  But defendants did not seek specific investigation files or specific correspondence among the Government that would support an argument that the Government knew or should have known long before about the conduct giving rise to its claims.  Again, it would be unfair and unreasonable to interpret these requests as seeking the extraordinarily broad discovery defendants' Recent Requests now seek.

Finally, defendants also point to requests thirteen through fifteen and thirty-six through forty in defendants' First Requests, alleging that these requests specifically sought "federal agencies' internal files."  (ECF No. 1145 at 7.)  However, none of these requests encompasses the specific materials sought in the Recent Requests and none of these requests raises the statute of limitations issue.

Request number thirteen sought documents related to Claimants' Internal Revenue Code § 501(c)(3) status.  (ECF No. 1445-2 at 9.)  Request number fifteen sought documents relating to the Alavi Foundation's prior mortgage and/or loan

from Bank Melli on 650 Fifth Avenue.  (Id.)  Request number thirty-six sought documents and internal files "relating in any way to the allegations in the Complaint"; Request number thirty-seven sought documents relating to Assa's designation as a "Specially Designated National"; Request number thirty-eight sought documents broadly relating to Claimants, Assa, or the allegations in the Complaint provided by the Government, or received from New York State, the City of New York, the New York Police Department, the District Attorney's Office or "any other office or agency"; and Request numbers thirty-nine and forty mirror Request number thirty-eight but are directed at materials from any foreign government or received from a third party, respectively.  (ECF No. 1445-2 at 13-14.)

These requests are, again, exceedingly broad and general.  Beyond the chronology and descriptions provided by defendants in connection with this motion, the Court has conducted its own comprehensive review of the previous discovery in this case.  This review allowed the Court to determine whether, during the discovery period, defendants had in fact interpreted their requests to have the breadth that they now claim, and whether defendants made specific motions to compel linking specific categories of documents to defendants' statute of limitations defense.  Below, the Court provides a detailed account of the discovery-related chronology and motion practice, which makes clear that the previous discovery sought by defendants did not encapsulate the discovery that defendants now seek.

C.    History of Discovery

The group of cases that are now consolidated in this action (under case number 08-CV-10934) were transferred to this Court in 2011 and 2012.  It is my

practice to handle discovery disputes directly; I do not refer them to magistrate judges.  Therefore, I was the judge who presided over the discovery disputes in this case during the discovery period.  This Court spent many, many hours personally handling the various discovery issues in this case.  There were numerous letters, conferences, and motions.  In particular, enormous time and attention was devoted to the FBI's investigative files throughout the discovery period.

Having comprehensively reviewed the past discovery proceedings in connection with defendant's instant application, the Court finds it absolutely clear that during the discovery period defendants did not timely seek or move to compel the discovery that they are now seeking.  To illustrate how the Court reached this conclusion, the Court sets forth a detailed chronology of major events that occurred during discovery proceedings.[2]

- As previously noted, the First Requests – the discovery requests to which defendants' Recent Requests and current motion must relate – were served on May 26, 2011.  (ECF No. 1445-2.)

- The Government objected to those requests on July 15, 2011.  (ECF No. 1445-3.)

- On October 17, 2011, counsel for defendants (Daniel Ruzumna) wrote to the Government with a proposal regarding the agencies from which defendants asserted documents had to be collected.  (ECF No. 1445-4.)

---

[2] The Court does not have access to all of the communications between the parties on discovery issues.  Nor is the Court attempting to cite every communication in connection with a discovery motion or other application.

These included the Internal Revenue Service ("IRS"), the Bureau of Immigration and Customs Enforcement, U.S. Customs and Border Protection, the Department of State, and the Department of Justice (including the FBI offices in New York and other states where Alavi owns property). (Id.)  Notably, no state or city agency was among those listed at that time.[3]

- On March 28, 2012, the Court held a conference on discovery and other issues. (See ECF No. 1445-12.)  At that conference, Ruzumna stated that defendants were still waiting for production from the Government. (Mar. 28, 2012, Tr. at 20:13-21:06.)  A lengthy discussion ensued.  Counsel for the Government (Michael Lockard) stated that defendants' document requests sought some documents from <u>federal</u> agencies other than the U.S Attorney's Office. (Id. at 30:03-10.)  Lockard represented that the parties were seeking to negotiate a narrowed scope and that the Government was actively working on gathering various FBI files and would make those files part of its conversation with defendants. (Id. at 30:14-31:12.)  Later in that same conference, the Court asked whether there were other "document discovery issues," and hearing nothing said, the Court stated: "None, ok." (Id. at 42:11-15.)  Ruzumna then added: "Other than, your Honor, our request to the Government to get the federal agency materials." (Id. at 42:16-17.)  The Court then directed the parties to

---

[3] The Recent Requests seek, <u>inter alia</u>, materials from state agencies.

confer on the matters raised at the conference and to "as quickly as you folks can, resolve your differences or ripen them and bring them to me." (Id. at 42:18-43:01.)  The Court then expressed the hope that document discovery could be completed in the next ninety days (id.), and set June 28, 2012, as the close of document discovery (id. at 44:6-9; id. at 46:8-17). In terms of depositions, Ruzumna added that he expected that defendants would want to depose some individuals "from the IRS and some of the federal agencies" but would have "less than maybe five to ten." (Id. at 47:22-48:01.)

- The parties continued to communicate regarding the federal agencies from which discovery would be produced.  In an email from counsel for defendants to the Government, dated April 25, 2012, defendants confirmed an agreement under which the Government was to produce materials from the U.S. Attorney's Office for the Southern District of New York, the FBI Offices in New York, and the Department of Treasury's Office of Foreign Assets Control ("OFAC"), as well as certain specified FBI offices outside of New York.  (ECF No. 1445-5.)  For the FBI offices outside of New York, counsel's email set forth proposed search terms and stated: "We further understand that more complete searches (to fully respond to our document requests) will be done at your Office, the local FBI offices, and OFAC."  (Id.)  Counsel also noted, "you agreed that the Government will attempt to locate and produce documents responsive to the narrowed

requests identified in Dan's email of October 17, 2011." (Id.)  Again,
neither the D.A.'s office nor the NYPD were mentioned.[4]

- On May 16, 2012, the Government sent an email to defendants regarding
searches of the Government agencies.  (ECF No. 1445-6.)  The
Government stated that it had not focused previously on getting records
from OFAC because OFAC had not been listed in the defendants' October
17, 2011, email.  (Id.)  The Government stated that it would, nevertheless,
make inquiries.  (Id.)  With regard to FBI records, the Government's May
16 email stated that "the case file for the investigation that led to the
forfeiture action is under review by FBI counsel.  We are inclined to query
the rest of the NY office as well as the Washington office, Baltimore
(Rockland) office, Houston office, and offices covering Carmichael CA and
Catharpin VA, for records relating to Alavi, Assa, 650 Fifth Avenue
Company, and the various current and former Assa and Alavi officers and
directors as described in items (d), (e) and (f) below." (Id.)  Included in the
Government's email is a list of 22 search terms (along with certain
variations).  (Id.)

- On May 17, 2012, Ruzumna responded to the Government's May 16 email.
(ECF No. 1445-7.)  Ruzumna reiterated defendants' request for OFAC
materials but did not raise any issues with regard to other agencies.  (Id.)

---

[4] In addition, the search terms included none of (for instance) the journalists who authored the
"nine" articles now part of the Recent Requests.  Moreover, by their nature, the search terms were
significantly narrower than the breadth of the Recent Requests, which now seek specific
investigative files and all records relating thereto.

Defendants' May 17 email references the Government's search term list and states that the addresses of Alavi's properties should be included, but that otherwise, "the only term that appears to be missing from an initial search is the Pahlavi Foundation of New York." (Id.) Notably, the email did not reference any of the materials in ¶1(m)(i)-(iii); ¶2, or ¶3 of the Recent Requests. (Compare ECF No. 1445-6 with ECF No. 1439-5.)[5]

- The Court held another lengthy in-person discovery conference on June 22, 2012. (See ECF No. 1445-13.) At that conference, Lockard reported on the status of production of the federal agencies' internal investigation files. (June 22, 2012, Tr. at 77:01-24.) He stated that it was a "much more time intensive process than we anticipated from when the discovery schedule was set" and that it was going to take additional time. (Id.) He stated that the "FBI's best estimate, right now, is that it could likely take several months to go through [the review] process" but that the Government was exploring "every option to try and speed that up." (77:25-78:12.) He further indicated that in particular, it was the "investigative files, the internal communications of the agency, the reports of interviews, things like that, that has taken us a lot of time to go through." (Id. at 79:07-17.) Ruzumna noted that defendants had yet to

---

[5] There is no doubt that defendants were able to have raised most if not all of their Recent Requests at this time. Paragraph two of the Recent Requests refers to the State and City agencies that, by this point, no one had mentioned searching; and paragraph three refers to publicly available news articles dating from 1980 through 2003. The Court deals separately below with the requests relating to the specific investigation files.

receive the documents from the federal agencies.  (Id. at 83:21-84:08.)
The Court ordered the Government to report back on the status of
production and a projected date for completion in six weeks.  (Id. at 84:09-
21.)  At the end of the conference, Lockard stated: "We have been doing a
lot of meeting and conferring about the scope of discovery requests and the
scope of the government's responses.  We have resolved a lot of issues
through that process, but I think we are in the process of teeing up a
handful of issues that we will bring to the Court's attention, and that will
be sometime in the near future."  (Id. at 88:04-13.)

- As directed, on August 6, 2012, the Government reported to the Court on
the status of its discovery efforts.  (See ECF No. 1445-14.)  The
Government reported that "the claimants' discovery requests in this case
encompass a broad range of investigative files maintained by the FBI
which must be reviewed for classified information and privilege.  The bulk
of the records relating to the investigation that led to the filing of the
forfeiture complaint in this matter are contained in a case file, which is
comprised of nearly one thousand documents (reports of interviews,
internal memoranda and similar records).  The case file also includes
various enclosures and subfiles, generally comprising records received
from third parties, handwritten notes, pen register records, surveillance
records, and similar materials.  The main case file in this matter amounts
to approximately 5,000 pages and the associated enclosures and subfiles

amount to an additional 25,000-30,000 pages [the Government noted that many of these might be duplicative of records already produced]. Additional paper records relating to the investigation have been collected, totaling over 80,000 pages altogether." (Id. (emphasis added))  The Government further reported: "The entirety of the main case file has been reviewed for possible declassification, and nearly all of the main file has been the subject of requests for partial declassification.  We expect more than half of these declassification requests to be transmitted for the final level of review and approval within the FBI shortly.  We expect that the remaining requests will follow in the footsteps of the first batch of requests." (Id.)  The Government added that "the case file also includes various enclosures and subfiles amounting to an additional tens of thousands of pages.  A substantial portion of these have already been produced by the Government."  And finally, the Government noted: "A search of electronic repositories of records is also being conducted. Approximately 115 custodians of potentially responsive electronic records . . . have been identified and their electronic records are being searched and de-duplicated." (Id.)

- On August 8, 2012, the Court ordered the Government to provide a "good faith and expeditious timeframe for completion so that all dates can be set and/or adjusted for the overall case." (Id.)

- On August 24, 2012, the Government responded to the Court's August 8 Order with a further report on the status of discovery and a projected date for completion.  (ECF No. 1445-15.)  The Government stated that it expected to be able to produce the main case file in the near future but that the remaining paper records from the FBI, totaling nearly 80,000 pages, were currently under review by a classification unit.  (Id.)  The Government estimated that it would take six to seven months to complete this process.  (Id. at 2.)  The Government further stated that the searches of the files associated with 115 identified potentially relevant custodians was in process and had resulted in an additional 200,000 pages of documents thus far, and that the review process for this material would take approximately ten to twelve months.  (Id.)

- On September 7, 2012, the Court held another in-person conference regarding discovery issues.  (See ECF No. 1445-16.)  Sharon Cohen Levin, for the Government, reported on the status of discovery.  She stated: "With respect to other agencies outside of the FBI, a very large quantity of stuff has already gone out.  We are planning within probably the next couple of weeks to make a supplemental production, which will include additional third party documents, the Ibrahimi journals, title search reports, IRS and State Department responsive documents, documents from Customs and Border Protection, as well as whatever small amount of stuff is producible from the Department of Treasury, Office of Foreign

Asset Control." (Sep. 7, 2012, Tr. at 5:03-6:24.) She continued, "The reason why there is not very much producible there is either there are items that essentially came from the FBI, so it's a duplication of what we are going to talk about next. Also, there are things that came from intelligence agencies which are classified." (Id.) She then turned to the FBI materials, and stated: "The real problem and the real slowdown is the FBI documents. There are three categories of documents. Two are paper documents. The first is the main case file. This is the investigative file in the case, and that has internal memos, 302s, and what you would normally find in an FBI file. There are about 1,100 documents, about 5,000 pages. There is also a subfile for this file, which includes pen registers and other information." (Id.) Levin stated that the subfile was the "big one" and had about 80,000 pages of documents." (Id. at 6:25-7:15.) She stated that she hoped to be able to bring that number down when duplicates were removed. (Id.) She also discussed the limited resources of the FBI team working on the declassification process and that the FBI's overtime budget had already been exhausted. (Id. at 8:05-9:13.) The Court asked the parties to confer and attempt to narrow the scope of production further; Ruzumna agreed to have such a conversation. (Id. at 9:14-10:07.)

- o Ruzumna then flagged an issue with narrowing the requests.[6] (Id. at 18:23-19:23.) He used as an example documents reflecting communications with third party sources: "If there is a report by the FBI that casts doubt on the main allegations in the complaint, both the government's complaint or the private plaintiffs' claims, we wouldn't get those unless we had picked the relevant individuals." (Id.) The Court then described obtaining a list of individuals who were/are actually related to the defendants and a list of third parties and then using such lists to narrow discovery, i.e., by obtaining documents relating to them. (Id. at 20:02-22:05.) The Court stated: "But I do want to try to test whether or not there is a large vein of documents, if you will, that will otherwise be missing." (Id.) The Court directed the parties to confer on the lists of inside and outside sources and to run certain searches; as to the remainder of the documents that would not be searched in that manner, the Court directed the parties to confer on a sampling protocol. (Id. at 22:13-25:16.)

- By order dated September 10, 2012, the Court directed the parties to report to the Court with regard to the status of matters relating to production of the FBI files not later than September 27, 2012. (ECF No.

---

[6] Specifically, the parties were discussing "modify[ing] the search string to add a connector in between the entities and individuals, the connector 'and,' which, [according to the Government's] understanding from the FBI, will reduce the number of documents that will be produced . . . ." (Sep. 7, 2012, Tr. at 18:06-20.)

307.)  The Court also set January 31, 2013, as the close of document discovery, as discussed during the September 7 conference.  (<u>Id.</u>; <u>see</u> Sep. 7, 2012, Tr. at 25:18-20.)

- On September 27, 2012, the Government reported to the Court that it had not been able to finalize a "sampling mechanism" with defendants.  (ECF No. 311.)

- On October 1, 2012, the Government reported that in consultation with, <u>inter alia</u>, defendants' counsel, the Government viewed an ESI search of the nine agents primarily involved in the investigation to be the most practicable, with the sampling to be done for other custodians.  (ECF No. 312.)  The Court then asked for a timeframe for completion.  (<u>Id.</u>)

- On October 5, 2012, the Government reported that an additional four to five months would be needed for review and production of ESI (following the end of "paper production"), largely due to the volume of classified material.  (ECF No. 314.)  The Court asked whether declassification could be done on a rolling basis.  (<u>Id.</u>)  On October 11, 2012, the Government responded that it was, in fact, being done in such a manner.  (ECF No. 315.)

- On October 12, 2012, the Court issued a revised scheduling order setting May 1, 2013, as the close of all fact discovery.  (ECF No. 316.)  The deadline for document discovery remained January 31, 2013.

- On November 9, 2012, the Court held another in person conference at which discovery progress was discussed.  (See ECF No. 336.)  Lockard reported that the Government was doing all that it could to meet the January 31 deadline for document production.  (Nov. 9, 2012, Tr. at 20:14-21.)  Lockard reported that the Government was working its way through the tens of thousands of pages relating to the nine primary custodians; Ruzumna stated that the parties had not yet agreed on a protocol to sample the roughly 120,000 pages that were associated in some way with the other custodians.  (Id. 20:22-at 22:15.)  The Court stated: "I just want to encourage you to keep your dialogue open to the extent that you need to so that people either feel comfortable with what is happening, or if they are not, they raise with me their concerns about it, and I will make any adjustments, if adjustments are appropriate, before we run out of runway."  (Id. at 22:16-24.)  Ruzumna stated, "I have no issues right now other than with the kind of speed at which it's going."  (Id. at 23:6-8.)

- On December 3, 2012, counsel for defendants sent an email to the Government containing a list of "the types of documents that we believe we have not yet received, as well as our understanding of the Government's status of review with respect to the production of these documents."  (ECF No. 1445-11.)  Included on this list were certain "[d]ocuments obtained from third parties"; certain "[r]esponsive documents in the possession of the USAO SDNY and FBI NYFO . . . .";

20

and certain "[r]esponsive documents from other Government agencies."[7]
(Id.)  Defense counsel noted its understanding that 80,000 pages of
electronic records that were culled from searches of the nine primary FBI
custodians (using agreed upon search terms) will be produced, and that a
sampling of electronic records generated through searches of the files of
FBI custodians other than the primary nine will be provided pursuant to
an agreed-upon protocol."  (Id.)

- On December 21, 2012, the Government produced the main FBI
  investigative file, along with an index.

- On January 31, 2013, the Government produced a CD containing over
  10,000 pages of documents from the FBI's investigative files.  The
  Government noted that the documents included the "1A subfiles
  (generally, attachments and enclosures), 302 subfiles (generally, reports of
  interviews or other law enforcement action), and forfeiture subfiles."
  (ECF No. 1445-8.)

- On January 31, 2013, the Government also filed a letter providing the
  Court and the parties with an update "concerning the production of
  records in this matter from files maintained by the [FBI]."  (ECF No. 347.)
  The Government reported that as of January 31, it had "produced over
  18,000 pages from the FBI main case file and associated subfiles relating

---

[7] These include the Department of Treasury, OFAC, IRS, ICE, U.S. Customs and Borden Protection, as well as the DOJ's Civil Division, specific FBI field offices, and DOJ's Terrorism Section and Department of State.  (ECF No. 1445-11.)

to the underlying investigation.  Approximately 26,000 pages from the paper case file are being processed for production.  Review of these documents by the Classification Unit is nearly complete and the documents are under review for privilege and production.  The FBI forecasts that it will be able to produce approximately 10,000 pages from this set of records by the end of February, with the remainder to be produced afterwards." (Id.)  The Government stated that the Classification Unit would next turn to 57,000 additional pages of ESI associated with the nine custodians.  (Id.)

- In a letter dated January 31, 2013, the Assa defendants noted that January 31 had been set as the date for all document production to have been completed.  (ECF No. 349.)  They noted a recent production of 15,511 pages of documents but stated that as to a large group of documents, there were logistical issues relating to formatting.  (Id.)

- On February 1, 2013, the Court held an in-person conference to discuss, inter alia, the status of discovery.  (See ECF No. 361.)  The Court stated that the "Government needs to apply whatever pressure it can to getting any of the documents which can be obtained out of various agencies, organizations, and other folks, as quickly as possible." (Feb. 1, 2013, Tr. at 50:21-52:5.)  The Court asked the Government whether it could complete its production by April 1; the Court further stated that it would consider precluding the Government's reliance on documents produced

after that date.  (Id.)  Lockard stated that this was "fine" and that the
Government's production of "the primary source materials, the bank
records, surveillance reports, interviews of witnesses" would be 90-95%
complete by the end of the month.  (Id. at 52:06-20.)[8]  Lockard represented
that "we've gone through extraordinary measures to declassify the
enormous amount of classified materials in this case, but it's taken a long
time.  It's also been, if not the largest declassification effort within the FBI
has undertaken in connection with litigation, it's up there."  (Id. 53:04-
54:02.)  Lockard estimated that 15% of the 20,000 pages were unclassified.
(Id. at 54:03-06.)  The Court requested that he confirm that estimate
within a week.  (Id. at 54:07-18.)  Lockard then previewed that the
Government might seek to "make an application to the Court to allow us
essentially to just exempt the rest of [the classified portion] from
production" because "it's classified, which would make it fall within a law
enforcement privilege," and "on the just straight-up discovery analysis of
burdensome versus benefit."  (Id. at 55:07-15.)  Lockard further indicated
that he did not believe sampling would be useful as the Government was
already turning over the main case file, and the classified documents
would consist of "all these e-mails talking about that investigation, which
I don't think it going to be really additive."  (Id. at 55:16-56:15.)

---

[8] Lockard also stated that the 57,000 pages of ESI had been consolidated down to 20,000 pages (as a result of reformatting).  (Feb. 1, 2013, Tr. at 53:04-54:02)

o  Ruzumna then raised the point that the 20,000 pages represented the files of the nine main FBI case agents.  (Id. at 57:20-58:06.)  He acknowledged, however, that defendants had received the main hard-copy case file.  (Id. at 59:18-60:10.)  He further indicated: "So there are going to be a lot of discovery motions, many discovery motions filed undoubtedly about this unless we're able to work this out with the government, which we're going to try."  (Id.)  Ruzumna stated further that defendants were waiting for some additional documents from OFAC and other federal agencies.  (Id. at 60:14-61:05.)

o  The Court then stated: "I assume that the primary defense of these defendants will be that they have evidence in their files that they are not [Iran] and that the defendants will be able to present witnesses and they will be able to present documentation, whatever evidence they deem appropriate, to demonstrate that they are not [Iran].  They will also have the opportunity to confront the information that the government intends to rely upon, because I would not allow the government to put on at trial a witness [as to whom] defendants have not had notice of and/or trial exhibits about which the defendants had not had prior notice.  So the defendants are going to have notice of every document that the government and/or plaintiffs are going to seek to introduce to demonstrate that

the entities here are [Iran] and that the assets are subject to
forfeiture and/or execution and turnover, etc., etc." (Id. at 61:06-
63:11.)

o   Ruzumna then commented on the Court's statement: "[Y]our Honor
has set discovery obligations time and again for the government,
and despite their best efforts and working very, very hard on it,
they have not met those time and time again.  And the response,
your Honor, has consistently been to allow that and to lessen the
burden on the government . . . .  Here, where the government has
had years and truly years to investigate this case, because the
original 302's go back many years your Honor, and has had access
to individuals who have been affiliated with the organization which
I represent, years and years ago, sometimes as much as 20 or 30
years ago, who live overseas, who we do not have access to, and the
government prepared over many months and years a civil forfeiture
complaint, filed that with all of this information using documents
that it chose to use to establish its case, and has essentially
produced those documents because, your Honor, as you recall,
ordered the government to identify those documents that it was
relying upon in its complaint, it only did so recently and it still has
not produced all of the documents they relied upon.  But the
documents they haven't relied on that meet the search terms, that

are highly relevant based on those search terms, and by the primary agents who were involved, are critical to casting doubt on the select few documents they have used." (Id. at 64:09-65:16.)

o   After further discussion, the Court stated that "all document discovery is going to close April 1.  It's the only way to draw a line here . . . ." (Id. at 65:24-67:05.)  Ruzumna then expressed his concern that the Government would call a witness at trial as to whom only helpful witness interview notes had been produced.  (Id. at 67:21-68:01.)  The Court acknowledged this issue and ruled that, to prevent it from occurring, the Government would have to provide a witness list by April 1, and as to all of those witnesses, the Government would have to insure that all witness interview notes had been produced.  (Id. at 68:02-68:23.)  The Court stated: "In other words, if there is Special Agent John Doe and he shows up or she shows up on a government witness list, they're going to have to, before April 1, make sure that they've done a particularly good job at ensuring that that special agent's documents have been scoured." (Id.)  Ruzumna then stated a concern that this might leave out documents going to the credibility of a witness.  (Id. at 70:19-21.) The Court then stated that ultimately there would have to be lines drawn and limits to the burden placed on the government.  (Id. at 71:21-72:01.)  In response to a concern then raised by the

Government regarding declassification, the Court said, "We are

going to cross the finish line in this case.  Bring me those issues,

bring them early, and, if necessary, bring them in camera . . . ."  (Id.

at 75:25-76:15.)

- Also on February 1, 2013, the Court ordered the Government to update
  the Court and all parties, not later than February 8, with regard to the
  production of unclassified ESI.  (ECF No. 348.)

- On March 15, 2013, the Court held another in-person conference.  (See
  ECF No. 1445-17.)  During that conference, Lockard reported: "So at the
  last conference, we talked about the status of production of documents
  from the FBI.  We were talking about the hard copy documents, as well as
  the electronic information.  With respect to the approximately 26,000
  pages of hard copy documents that were still outstanding at the last
  conference, about 9,000 have been produced from the FBI.  They are
  working on the rest.  They know about the April 1 deadline . . . ."  (Mar.
  15, 2013, Tr. at 37:10-23.)  Lockard reported further that the ESI was at
  the back of the production line and that he was not optimistic that it
  would be produced before April 1.  (Id. at 38:02-19.)  He described the
  documents at issue as the 20,000 that related to the eleven (previously
  referred to as nine) case agents, a portion of which were unclassified.  (Id.
  at 39:05-16.)  The Court proceeded to question the Government on its
  review process.  (Id. at 39:17-43:19.)  Notably, the Court asked for a date

range for the ESI at issue.  Lockard represented that the documents

"certainly don't go back to 1995.  I would say the investigation that this all

relates to came about in approximately 2005, 2006, somewhere in that

timeframe.  So everything should be, generally, within that range."  (Id. at

44:07-24.)  Lockard further represented that the main case file "has

already completely been produced."  (Id. at 46:11-17.)  According to

Lockard, in terms of volume, the Government had produced "more than 90

percent" of the documents in this matter and the Government had

"produced the overwhelming majority of the discovery."  (Id. at 48:09-23.)

He also stated that the Government had produced materials from the IRS

and the Department of State concerning proceedings in front of the U.S.

Iran Claims Tribunal.  (Id. at 49:06-22.)

o   Lockard previewed that there were documents from OFAC that
    were likely to be the subject of motion practice.  (Id. at 50:03-14.)
    He further stated, however, that OFAC was not "an investigative
    agency.  They receive documents that come in from elsewhere."  (Id.
    at 50:22-51:02.)

o   Ruzumna stated that there were still documents other than the
    20,000 pages from the relevant case agents – i.e. those that the
    parties had discussed sampling – that were still out there.  (Id. at
    53:07-54:04.)  Lockard then explained to the Court that the larger
    group of documents (as to which sampling had not occurred) were

from custodians who would not have been participants in the
investigation, but would have – for one reason or another – possibly
received a relevant document.  (Id. at 54:22-56:07.)  The Court then
stated that the parties needed to confer again on this issue, and "[i]f
there is going to be a category of documents as to which there is
particular disagreement, as to whether they should be produced or
not be produced, and whether or not there is any relevance in them
or whether it's duplicative, or whatever the arguments are pro and
con, I think we ought to get that not only produced onto the record
here, orally, people have an opportunity to describe why they think
it's relevant, and if they believe they are prejudiced, then to state
that.  And I'll make a ruling based on that."  (Id. at 57:10-58:01.)
Following a meet and confer on this, the Court stated that any
remaining issues should be raised with it immediately.  (Id.)  The
Court reiterated that "after April 1st, Mr. Ruzumna, anybody who
wants to object on . . . the nature of the production, they should at
that point go ahead and bring a motion in writing."  (Id. at 61:24-
72:12.)

- Later on March 15, 2013, the Court issued a written order stating: "Not
  later than April 15, 2013, any party wishing to object to the discovery
  produced by another party prior to the April 1, 2013 discovery deadline,
  shall submit a letter to the Court."  (ECF No. 370.)

- On April 1, 2013, the Government filed a letter with the Court providing a status update.  In that letter, the Government stated, "At this time, we believe that all such responsive, non-privileged documents have been produced with the exception of electronically stored information ('ESI') . . . ."  (ECF No. 392.)  The Government represented that its production included 104,000 pages and disks of investigative files (in addition to approximately 758,000 pages and discs of other records).  (Id.)  The Government further stated: "We anticipate that the unclassified portion of the ESI maintained by the 11 identified key FBI custodians will be produced by the end of this month.  While the content of this ESI is still being reviewed, we do not expect it to include documents or information (other than information previously produced from other sources) upon which we would rely affirmatively.  Accordingly, at this time we do not anticipate a request to be permitted to rely on these records."  (Id.)

- On April 8, 2013, the Greenbaum, Acosta, Beer, and Kirschenbaum plaintiffs requested that the Court extend the discovery deadline from May 1, 2013, to July 1, 2013.  (ECF No. 404.)  The basis for this request was the "voluminous production of documents [that] was made by the Government and other parties in recent days in order to meet the April 1 close date for document discovery in this matter."  (Id.)

- On April 11, 2013, defendants responded to the request for an extension of the discovery deadline.  (ECF No. 407.)  Defendants consented to an

extension, but requested that the deadline be extended only until June 28, 2013.  (Id.)

- The Court granted an extension to June 28, 2013, but noted that it was not extending the then passed April 1 deadline for document production. (Id.)

- On April 15, 2013, defendants filed a letter motion to compel discovery. (ECF No. 412.)[9]  That motion never once raised the statute of limitations as an issue in connection with document production.  Instead, the letter recited the rather tortured history of discovery.  The letter raised concerns regarding the Government's failure to fully produce all of the ESI; failure to provide a privilege or classification log; and failure to make "complete production" from "other federal agencies, including the IRS, Department of State, and OFAC." (Id.)  The letter raised these deficiencies without in any way connecting the Government's failures to defendants' statute of limitations defense.[10]  Defendants sought four specific types of relief:  (1) the Government should arrange for defendants' legal team to apply for clearance to allow them to see the classified documents; (2) alternatively, the Government should provide a detailed summary of withheld documents or a statement admitting relevant facts; (3) the Court should reject the Government's assertion of the law enforcement privilege; and (4)

---

[9] This letter is reproduced in unredacted form at ECF No. 1445-18.

[10] Nor were any of the other specific investigation files or materials relating to the news entities that are part of the Recent Requests raised.

the Court issue an adverse inference jury charge with respect to withheld documents.  (Id.)

- On April 25, 2013, the Government responded to defendants' April 15 letter.  (ECF No. 433.)  The Government opposed the relief that defendants' sought.  The Government first noted that it had in fact produced nearly one million pages of documents.  (Id. at 1 n.1.)  The Government also noted that defendants' letter "principally concerned classified information redacted from discovery produced from FBI files." (Id. at 3.)  The Government stated that it expected that the FBI would shortly be making a formal assertion of law enforcement privilege, which would seek to protect material that had been redacted from records produced in discovery, including information that is also classified.  (Id.) The Government provided its response to the remainder of defendants' requests as well.  Again, no mention was made of any statute of limitations issues.

- On April 30, 2013, the Court ordered the Government to inform the Court of the date by which the FBI intended to make its formal assertion of privilege and to provide a random (but representative) sample of at least 50 documents withheld on the basis of law enforcement privilege.  (ECF No. 434.)

- On May 9, 2013, defendants submitted a letter in opposition to the Government's April 25 letter.  (ECF No. 1445-23.)  Defendants argued

again that the Government had failed to make full production; had failed to produce a privilege log; and had failed produce its witness list.  (Id.) Defendants asserted that the Government should be required to show "extremely good cause" why it should not be precluded from calling witnesses at trial; that the Court should deem the Government's privileges waived, or at a minimum require the Government to provide a privilege log; and should give defendants access to non-privileged classified documents.  (Id.)  This reply again failed to mention the relevance of any documents to defendants' statute of limitations defense.

- On May 29, 2013, the FBI submitted an application for invocation of the law enforcement privilege and submitted supporting papers to the Court in camera.

  - On June 10, 2013, defendants raised a number of concerns regarding the assertion of that privilege.  (ECF No. 514.)  Again, Claimants failed to raise any issues regarding this privilege with regard to their statute of limitations defense.

- The Court reviewed the Government's submission and supporting papers regarding the assertion of the law enforcement privilege.  (ECF No. 524.) By order dated June 21, 2013, the Court notified defendants that it had asked the Government to answer additional questions ex parte and in camera regarding that material.  (Id.)

- On July 9, 2013, defendants filed a letter application requesting that "all outstanding discovery be produced promptly."  (ECF No. 1445-31.) Defendants repeated the issues previously raised regarding the Government's production of ESI; the lack of full production from the IRS and State Department; and the lack of any production from OFAC.  (Id. at 3-6.)  In their letter, defendants argued that documents, if they existed, might be <u>exculpatory</u> (e.g. "Documents prepared by the Department of State indicating that the Foundation is not controlled by the [Government of Iran]").[11]  (Id. at 5.)  Defendants further acknowledged that while they had received the "302s" from FBI interviews, they had not received the contemporaneous handwritten notes; defendants argued that such notes might be useful for impeachment.  (Id. at 5-6.)  Not a word in the letter refers to defendants' statute of limitations defense.

- By order dated July 11, 2013, the Court denied defendants' motion to compel documents withheld on the basis of the law enforcement privilege or national security classification or, in the alternative, to produce a detailed privilege log.  (ECF No. 1445-32.)  The Court's decision had been based on a detailed in camera review of certain documents.  (Id.)  As part of its July 11 Order, the Court required that the Government provide a letter attesting to the fact that the sample of documents that the

---

[11] Notably, this basis is counter to the premise of defendants' application herein.  The statute of limitations defense is premised on existing <u>inculpatory</u> materials (that defendants argue triggered the limitations period).

Government had provided to the Court was representative of those items withheld in the production as a whole.  (<u>Id.</u>)  The Court also required the Government to produce certain ESI pursuant to a sampling methodology. (<u>Id.</u>)

- On August 8, 2013, defendants moved to compel production of "proper discovery" from OFAC in advance of defendants' deposition of an OFAC representative.  (ECF No. 1445-33.)  Defendants again framed this discovery as "exculpatory" and important to demonstrating that defendants were not "controlled by the Government of Iran."  (<u>Id.</u> at 4.)

  o Defendants explained that in December 2008 Assa had been added to the Specially Designated National ("SDN") list of entities and individuals whose assets were "blocked."  (<u>Id.</u> at 2.)  Defendants noted that as of the date of the filing of the asset forfeiture complaint (and their August 8 letter), defendants had not themselves been added to the SDN list.  (<u>Id.</u> at 3.)  According to defendants, "The absence of [defendants] on the SDN list then or now is not the result of OFAC being unaware of their existence or their alleged ties to Iran.  Indeed, based on an investigative report prepared by the [FBI]'s Counterintelligence Division: 'in the mid-1990s, financial information obtained in the [Alavi Foundation] investigation was provided to the IRS and OFAC to determine if any potential criminal violations existed.  Both IRS and OFAC

determined that no criminal evidence could be found at that time.'"

(Id.)  In other words, defendants expected information from OFAC

to be exculpatory.  (See id.)  The letter did not raise the statute of

limitations defense as a basis for the motion to compel.

- In an order dated August 29, 2013, the Court resolved defendants' August

8 motion to compel.  (ECF No. 757.)  The Court first summarized the

materials that it had reviewed:  defendants' motion; the Government's

August 13 opposition; the Government's August 15 responses to the

specific questions ordered by the Court; an additional letter submitted by

defendants on August 15; and the in camera submission of withheld

OFAC documents.  (Id.)   Following review of all of these materials, (none

of which discussed the statute of limitations defense), the Court denied

defendants' application.  (Id.)  As part of its decision, the Court addressed

the arguments by the parties and the relevance of the OFAC documents to

the pending action.  (Id.)  The Court did not address the statute of

limitations because it had not been raised by the parties.

- In a letter dated August 30, 2013 – 10 days before the commencement of

trial – defendants sought guidance from the Court regarding the

appropriate scope of the law enforcement privilege at the upcoming

deposition of OFAC's Rule 20(b)(6) designee.  (ECF No. 1445-35.)   In this

context, and for the first time, defendants stated that the "Federal

agencies' past investigations of Claimants are highly relevant for, among

other things, Claimants' statute of limitations defense." (Id. at 2.)
Defendants further stated: "There is a good faith basis to believe that
OFAC (and the IRS) were aware or should have been aware of Claimant's
alleged violations of the International Emergency Economic Powers Act
("IEEPA") as early as the mid-1990s." (Id. at 3.)  Defendants attached to
their application a 2007 FBI report about the Alavi Foundation, which
stated that "in the mid-1990s, financial information obtained in the
investigation was provided to the IRS and OFAC to determine if any
potential criminal violations existed.  Both IRS and OFAC determined
that no criminal evidence could be found at that time." (Id. at 3, 5-8.)
Notably, no documents were sought as part of this application – just relief
relating to the deposition of an OFAC representative.[12]

- By Order (issued the same day), the Court required defendants to set
  forth the specific questions that they sought to pose to OFAC.  Defendants
  provided the Court this information; defendants' submission listed nine
  lines of inquiry.

- By Order dated September 1, 2013, the Court found that "[a]ll of the
  questions posed . . . seek to invade the law enforcement privilege and
  deliberative process privileges." (ECF No. 774.)  The Court accordingly

---

[12] Defendants also sought leave to file a Rule 37 motion for sanctions based on their recent deposition
of an IRS representative. (ECF No. 1445-35 at 4.)  Defendants claimed that the IRS representative
refused to testify, invoking privilege, regarding past investigation of defendants. (Id.)  Defendants
also argued that they learned during the deposition, for the first time, that the IRS had destroyed all
documents relating to past investigation of defendants. (Id.)  Defendants argued that the
information about which the IRS refused to testify and was likely contained in the destroyed
documents was relevant to defendants' statute of limitations defense. (Id.)

issued a protective order as to the questions.  (Id.)  The Court nonetheless
ordered the OFAC representative to appear for a 30(b)(6) deposition to
afford defendants a fair and complete opportunity to examine other topics.
(Id.)

- On September 6, 2013, defendants moved for an adverse inference with
  regard to documents that the IRS had destroyed.  (ECF No. 1445-38.)
  This letter mentioned – for the first time – the "1995 Spectator article by
  Kenneth Timmerman."  (Id. at 2.)  It also referenced a separate Newsday
  article.  In this context, defendants stated that "the Government was
  engaged in what appears to have been a continuous criminal investigation
  of Claimants since at least 1996."  (Id. at 3.)  In the penultimate
  paragraph of their letter, defendants state: "The fact that three federal
  agencies – the FBI, the IRS and OFAC – were aware of the precise
  allegations made in the Amended Forfeiture Complaint since 1996 is
  highly relevant to Claimants' statute of limitations defense."  (Id. at 4.)
  The only relief sought, however, was an an adverse inference with respect
  to the IRS.  (Id.)

The Court has provided the above recitation to make clear that during the
discovery period defendants did not timely seek or move to compel the discovery set
forth in the Recent Requests that they are now seeking.  During the discovery
period, defendants never made a motion to compel and the Court was never asked
to rule on documents sought to support defendants' of limitations defense.

D.    Discussion of the Statutes of Limitations on Appeal

As noted above, the Second Circuit affirmed this Court's September 16, 2013, decision that Assa was in fact a front for Iran but reversed and remanded with regard to certain other issues concerning the defendants.  See In re 650 Fifth Ave. & Related Properties, 830 F.3d.  The Second Circuit held, inter alia, that this Court erred in rejecting defendants' possible statute of limitations defense without providing defendants an opportunity to be heard on such defense.  Id. at 96-97.  In footnote 28 of the Second Circuit's decision, the court stated: "The District Court had repeatedly denied Claimants' attempts to obtain discovery that might show when the Government learned of the Claimants' alleged forfeitable offenses."  In re 650 Fifth Ave, 830 F.3d at 97 n.28.  The court also stated that the record was "hardly developed at all on the statute of limitations question."  Id. at 97.

Defendants rely on the statements made by the Second Circuit to support their motion to reopen discovery.  As already discussed, however, this Court did not deny defendants attempts to obtain discovery regarding their statute of limitations defense – principally because defendants never made such attempts during the discovery period.  Rather, it appears to this Court that the Second Circuit was provided with an incomplete picture of the discovery in this case.

In their brief before the Second Circuit, defendants pointed to three specific instances in which this Court allegedly "depriv[ed] Claimants of access to discovery on issues concerning the statute of limitations."  (ECF No. 1439 (quoting Appellate Br. at 126 n.33.)  Defendants stated:

In particular, the District Court denied Claimants' motion to compel documents from OFAC regarding the Government's past investigations of the Foundation [citing the Court's August 29, 2013, Order at ECF No. 757]; denied Claimants' motion for spoliation against the Government relating to documents destroyed by the IRS relating to the Government's past investigation; [and] prevented Claimants from questioning OFAC's Rule 30(b)(6) designee about such prior investigations during deposition [citing the Court's September 1, 2013, Order at ECF No. 774].

(Appellate Br., at 127.)

Defendants' arguments made to the Second Circuit – and the accompanying record citations – provided a substantially incomplete (and misleading) picture of discovery in this case. Defendants' August 8, 2013, motion to compel (which was resolved by the Court's August 29 Order at ECF No. 757) did not raise the statute of limitations defense as defendants alluded to the Second Circuit, but focused on potentially exculpatory evidence that would demonstrate that defendants were not controlled by the Government of Iran. In fact, it was not until August 30, 2013 – a mere ten days before trial and after all discovery deadlines – that defendants raised any concerns regarding discovery as related to their statute of limitations defense. Even then, defendants raised this issue in the context of the OFAC deposition and IRS deposition, not broader document production. Indeed, none of the Recent Requests were presented to the Court for a ruling during the discovery period or even up to initial resolution on summary judgment. In short, when the full discovery record is reviewed, it is clear that defendants did not timely seek, and the Court did not deny, the discovery now sought.

II.     CONCLUSION

Defendants are entitled to present their statute of limitations defense.

However, for the reasons discussed above, defendants' motion to reopen discovery is

DENIED.  The Clerk of Court is directed to terminate the motion at ECF No. 1439.

SO ORDERED.

Dated:        New York, New York
              February 28, 2017

_____
        KATHERINE B. FORREST
        United States District Judge